**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Dennis L. ROBERTS, also known as Douglas Campbell, also known as Robert Murphy, Douglas R. Jones, Pamela J. Faught, and Bryan L. Huff, Defendants–Appellants.**

Nos. 92–3542, 92–3821, 92–3829, 92–3866 and 92–3914.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 7, 1993.

Decided May 2, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied July 6, 1994.

---

Charles Goodloe, Jr., Asst. U.S. Atty. (argued), Sharon McConaha Jackson, Office of the U.S. Atty., Indianapolis, IN, for plaintiff-appellee.

Scott McFarland, Muncie, IN (argued), for defendant-appellant Dennis L. Roberts.

Stephen A. LeClair, Entin, Schwartz & Margules, Miami, FL (argued), for defendant-appellant Douglas R. Jones.

Larry C. Gossett, Greenfield, IN (argued), for defendant-appellant Pamela J. Faught.

Thomas R. Ruge, Lewis & Kappes, Indianapolis, IN (argued), for defendant-appellant Bryan L. Hoff.

Before BAUER, WOOD, Jr., and FLAUM, Circuit Judges.

BAUER, Circuit Judge.

Dennis Roberts, Douglas Jones, Pamela Faught, and Bryan Huff were convicted under 18 U.S.C. § 2314 of devising and conspiring to devise a fraudulent scheme which in its execution induced persons to travel in interstate commerce and to spend $5,000 or more. Roberts was also convicted of evading and conspiring to evade taxes as well as willfully filing a false tax return in violation of 26 U.S.C. §§ 7201 and 7206(1). Their convictions stem from a series of transactions in which members of the scheme fraudulently

sold lottery device distributorships. They all appeal their convictions; Roberts also appeals his sentence, and we affirm.

## I.

Lucky Lotto and Old Doc's Lucky Number Hotbox are coin operated devices designed to assist participants in a state lottery game. Customers who are somehow incapable of selecting numbers in the lottery may, for twenty-five cents, enlist the aid of these machines. The machines dispense tickets containing purportedly lucky numbers which the customer can then use to play the lottery. In the fall of 1984, Eugene Hill and Michael Ellis acquired the rights to sell distributorships for these machines through their own Indianapolis-based sales organization, Hiawatha, Inc. Depending on the number of machines ordered, the price of a distributorship ranged between $10,000 and $65,000. For three years, Hiawatha marketed the machines nationwide until May of 1987 when a fire destroyed its offices.

Hiawatha typically promoted its distributorships as follows. A prospective buyer would be located either through advertisements in local newspapers or at trade shows. An introductory meeting would then be scheduled at which Hiawatha's salespersons would make a detailed presentation about the business. In these introductory meetings, Hiawatha made several representations. First, the salespersons maintained that revenues from the machines were correlated to the number of machines purchased and that as a general rule the machines would pay for themselves within three to six months of their installation. Second, Hiawatha told prospective buyers that a chain of nationwide convenience stores had agreed to allow Hiawatha distributors to install the machines in their stores. Third, to allay fears concerning the venture's riskiness, Hiawatha's salespersons promised to provide extensive post-purchase marketing assistance to distributors. Finally, as an incentive to lottery participants, Hiawatha offered an additional cash prize to winners who used Lucky Lotto or the Hotbox to choose their number. Hiawatha's representatives assured prospective distributors that Lloyd's of London had written an insurance policy which would cover the bonus prize.

To further promote the machines, Hiawatha salespersons would put potential distributors in contact with persons alleged to be successful and satisfied distributors. These persons, referred to by Hiawatha as "singers," would provide testimonials confirming the profitability of the business.

The marketing of distributorships in California was handled more carefully because it was seen as a particularly lucrative opportunity. Prospective buyers were invited to attend presentations in various California hotel suites, and if they were still interested, they were required to make an initial deposit of $5,000 and sign a commitment to purchase. Hiawatha then flew the interested persons to Chicago to meet a singer who Hiawatha claimed was the distributor for the Chicago area. The singer provided the prospective buyer with a tour of their operations which typically included the opportunity to see all the vending equipment full of money.

Hiawatha then flew the prospective buyer to Indianapolis where they were given another presentation followed by a tour of Hiawatha's warehouse. The prospective buyers were shown a computer screen detailing the large volume of tickets being sold through Hiawatha's equipment. After the wining and dining was complete, buyers were asked to sign a contract and to pay at least half of the $65,000 price for which 100–machine packages were sold. California distributors were promised that their distributorships would be regionally exclusive of one another.

Once a distributorship was sold, Hiawatha would dispatch to the distributor a purportedly independent consultant, called a "locator," who, based on his or her claimed special expertise, would select the most desirable store locations for the distributor's machines. The locator would then approach the store owners about allowing the distributor to install a Hotbox in their store. Representations made in the discussions with store owners were similar to those made in the introductory meetings between salespersons and potential distributors.

Several of the representations made to prospective distributors by Hiawatha's salespersons were revealed to be either false or misleading. For instance, Hiawatha never had an insurance policy covering the bonus prize for lottery winners who used the Hiawatha machines. Nor did Hiawatha have an agreement with any convenience store chain governing access for its machines. And despite promises to the contrary, distributorships in California were not territorially exclusive. Little, if any marketing assistance was provided to distributors once the machines were installed. Finally and most importantly, the revenues represented as typical by the salespersons were never close to the revenues realized by any distributors. The computer screen figures which were shown to California distributors and were alleged to represent machine revenues were bogus.

Claims made by the singers and locators were also fraudulent. The singers were not authorized distributors, but rather Hiawatha employees who had been paid to pose as distributors and to confirm falsely the profit figures which the salespersons had projected. For example, the singer introduced to California buyers as the Chicago distributor of the Hotbox was in fact the wife of Dennis Roberts, a principal in the operation and a defendant in this case. At trial, she admitted that she was never a real distributor and that she filled the machines with money to impress the prospective buyers. The locators had no expertise on selecting stores for the distributors nor were they independent. Like the singers, they were all Hiawatha employees.

The appellants in this case played various roles in the venture. Dennis Roberts, a long-time associate of Eugene Hill's, was officially designated Hiawatha's customer relations manager but his duties were more diverse. He served on occasion as either a salesperson or as a singer, and along with his wife, was responsible for setting up the fraudulent Chicago distributorship used to deceive the buyers from California. Together with Hill and Ellis, Roberts received a third of Hiawatha's profits disguised as corporate expenses so as to avoid taxation.

Pamela Faught started out as a salesperson and later became a locator for Hiawatha. Bryan Huff was a singer and later a locator for the business. Douglas Jones was one of Hiawatha's most successful salespersons. His talents led Hiawatha to include him in the lucrative California sales effort.

Reports of fraud in connection with Hiawatha's activities gave rise to the prosecution of this case. In December of 1990, the grand jury indicted seventeen members of Hiawatha's management and staff on theories of conspiracy, fraud, perjury, and related tax offenses. A jury convicted Faught, Huff, and Jones of conspiracy to commit travel and wire fraud. Roberts pleaded guilty to three counts of travel fraud and one count of conspiracy to commit travel and wire fraud. A jury convicted Roberts of conspiring to evade taxes and of willfully filing a false tax return in violation of 26 U.S.C. §§ 7201 and 7206(1).

## II.

Each of the four defendants challenge certain aspects of their convictions and sentences. We consider their claims in turn.

### A. Bryan Huff and Pamela Faught

Huff and Faught contend that the evidence supporting elements essential to their conspiracy and travel fraud convictions was insufficient. Their burden is to demonstrate that even when viewed in a light most favorable to the government, the evidence is such that no rational trier of fact could have found the defendant guilty. *United States v. Campbell*, 985 F.2d 341, 344 (7th Cir.1993).

Huff and Faught first challenge the evidentiary support for their conspiracy convictions. A conspiracy is an agreement between two or more persons to commit a criminal act. To establish that the defendant was a participant in the conspiracy, the government must prove beyond a reasonable doubt that the defendant knew of the conspiracy and that the defendant intended to join and further the conspiracy's aims. *Id.* at 345. Huff and Faught contend that the government failed to prove this element beyond a reasonable doubt. The record demonstrates otherwise.

As a preliminary matter, evidence pertaining to the general nature of the fraud supports the jury's conclusion. Ellis testified that for the venture to work, it was imperative that salespersons, singers, and locators, Huff and Faught included, be aware of precisely what was going on, so that at each stage of the sale, their statements were consistent. For the venture to be successful, no participant could be ignorant.

Evidence against Huff and Faught individually reinforces this conclusion. Several witnesses testified that Huff led them to believe that he was an independent distributor who had done very well financially from his Hiawatha purchase. Yet as Michael Ellis testified, although Hiawatha held him out as such, Huff was never an independent owner and operator of Hiawatha equipment. He was given a few machines and instructed as all Hiawatha singers were instructed: to promote the profitability of the Hiawatha machines.

Faught argues that her promotional efforts are insufficient to tie her to the conspiracy because they were not misrepresentations but rather fall within the rubric of permissible puffery. The evidence directly rebuts her claim. Hiawatha distributors testified that in her capacity as a locator, Faught made representations to storeowners which were patently false. She told storeowners about the fictitious Lloyd's of London insurance policy even though Hiawatha had never even approached Lloyd's about this. Additionally, Faught's estimates concerning the profitability of the machines were so inflated that they go beyond puffery. She told storeowners to expect a minimum of $30 per week per machine. In reality, the machines averaged $3 per week per machine. Viewed in a light most favorable to the government, the foregoing evidence strongly suggests that Huff and Faught were fully aware of the venture and their own role in it.

Both Huff and Faught make sufficiency challenges to the evidence supporting their travel fraud convictions under 18 U.S.C. § 2314.[1] They claim that the government failed to present evidence which demonstrated that they caused anyone to travel in interstate commerce in furtherance of a fraudulent scheme. Their claim is based on a misunderstanding of the law. It is not the defendant who must induce a person to travel but rather the fraudulent scheme itself. *See United States v. Wiehoff*, 748 F.2d 1158, 1161 (7th Cir.1984); *United States v. Benson*, 548 F.2d 42, 46 (2d Cir.), *cert. denied*, 431 U.S. 939, 97 S.Ct. 2652, 53 L.Ed.2d 257 (1977). In fact, it is not even necessary for the defendant to have personal contact with the defrauded party. *United States v. Biggs*, 761 F.2d 184 (4th Cir.1985). If the defendant is a knowing and active participant in the scheme and the scheme induces a victim to travel across state lines, the defendant can be convicted. *Wiehoff*, 748 F.2d at 1161.

Due to its factual similarity, *Wiehoff* is particularly relevant. The scheme in that case involved the fraudulent selling of pizza distributorships. The principals would refer potential investors to a cohort named Wakefield. Wakefield would then make misleading statements promoting the profitability of owning a pizza distributorship. Based on evidence that Wakefield was given his distributorship for free and evidence that he was overstating its value, we held that the jury could have properly found that he was falsely posing as an independent distributor in an effort to further the scheme, and we upheld his convictions for mail and travel fraud. Our conclusion turned on the fact that the scheme itself caused interstate travel. Since it is undisputed that Hiawatha's scheme caused many prospective distributors to travel across state lines and spend in excess of $5,000, as in *Wiehoff*, we uphold Faught and Huff's convictions.

---

1. 18 U.S.C. § 2314 provides in relevant part:
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person or persons to travel in, or be transported in interstate or foreign commerce in the execution or concealment of a scheme or artifice to defraud that person or those persons of money or property having a value of $5,000 or more ...

 \* \* \* \* \* \*

 Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

B. *Dennis Roberts*

Roberts claims that his conviction and his sentence were the result of three separate reversible errors. After a thorough consideration of his claims, we affirm the decision of the trial court.

■ 1. *Sentencing.* Roberts's first claim is that because the conspiracy charges in the indictment allege that the conspiracy lasted until March of 1988, his convictions qualify as "straddle crimes" for sentencing purposes. Straddle crimes are ongoing crimes which begin before, but end after, November 1, 1987, the date on which the United States Sentencing Guidelines took effect. The Guidelines apply to straddle crimes. *United States v. Fazio,* 914 F.2d 950 (7th Cir.1990). Roberts concludes that his sentence, calculated under pre-Guidelines law, was erroneous. The government defends the sentence on the grounds that the choice of a sentencing provision must be based on the factual basis supporting the verdict and not on the allegations contained in the indictment.

The Fourth Circuit in *United States v. Bakker,* 925 F.2d 728 (4th Cir.1991), had occasion to address the precise question now facing us. There, the court held that determining when the crime ended should not be governed by the date in the indictment. *Id.* at 739. Rather, the inquiry should be based on the evidence before the trial court. *Id.* The court offered two reasons for its conclusion. First, the court noted that at the time an indictment is drafted, the government's knowledge is limited and the ending dates are, therefore, often tentative and subject to change as more information comes to light. *Id.* Second, reliance on the allegations of the indictment would allow the government to manipulate the sentencing basis for the defendant. *Id.*

Roberts argues that *Bakker* does not apply to convictions such as Roberts's travel fraud conspiracy conviction which result from a plea. He contends that when a defendant's conviction results from a plea, the allegations in the indictment should determine whether the defendant should be sentenced under the Guidelines. As we see it, the reasoning set forth in *Bakker* holds true regardless of whether the conviction is obtained through a plea or through a jury verdict. Sentencing determinations are based on the factual basis of the charge to which the defendant pleads guilty. *United States v. Morrison,* 938 F.2d 168, 171 (10th Cir.1991). Though remand may be appropriate when the factual basis is unclear, *see, e.g., United States v. Masters,* 924 F.2d 1362 (7th Cir.), *cert. denied,* 500 U.S. 919, 111 S.Ct. 2019, 114 L.Ed.2d 105 (1991), that is not at issue in our case. The evidence presented at Roberts's plea hearing like the evidence offered at his trial indicates that the criminal acts at the heart of the Hiawatha conspiracy ceased when its building burned down in May of 1987. Consequently, sentencing Roberts according to the law as it existed before the Guidelines went into effect was not erroneous.

Roberts's response is that acts taken by the defendants to conceal Hiawatha's activities from detection constitute overt acts in furtherance of the conspiracy. Because some of these acts occurred after November 1, 1987, Roberts concludes that the conspiracy qualifies as a straddle crime.

In *Grunewald v. United States,* 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), the Supreme Court examined the effect of concealment on criminal conspiracies. Noting the inherently secretive nature of a criminal conspiracy, the Court recognized that relying on acts of concealment to determine the life of a conspiracy would render most conspiracies of indefinite duration. The Court believed it to be more sensible to draw a distinction between "acts of concealment done in furtherance of the *main* criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime." *Id.* at 405, 77 S.Ct. at 974.

Based on its analysis, the Court in *Grunewald* held that the destruction of certain records and attempts to mislead the grand jury were desperate attempts to cover up after evidence of the crime began to surface. *Id.* at 403, 77 S.Ct. at 973. The underlying tax offenses which were the subject of the conspiracy had been completed and while it was necessary to keep the illegal activities a

secret, these actions were not part of the conspiracy.

Roberts claims that actions taken by his coconspirators to impede the investigation of Hiawatha were evidence that the conspiracy remained active. We find, however, that in this respect, his case is indistinguishable from *Grunewald.* Measures taken to conceal records from detection and to impede the government's investigation were merely after-the-fact cover up measures taken long after the criminal objectives of the conspiracy had been accomplished. Thus, in light of *Grunewald,* we hold that the trial court's sentencing decision was proper.

■ 2. *Similar Acts Evidence.* Roberts's second allegation of error concerns the admission into evidence of proof that during the course of the Hiawatha conspiracy, an audit conducted by the Internal Revenue Service revealed that Roberts owed approximately $2,000,000 in unpaid taxes. At issue here is not whether evidence of the obligation was admissible but rather whether evidence of the exact amount was admissible. We review a trial court's evidentiary decisions under an abuse of discretion standard. *United States v. Allen,* 930 F.2d 1270, 1273 (7th Cir.1991).

In his trial for the tax-related offenses, Roberts's defense was that he never wilfully or knowingly evaded any of his obligations. He claimed that all the acts that he had taken with respect to income and profits received from Hiawatha were done on the advice of Hiawatha's bookkeeper under the belief that the actions were legal. Knowing that the government would bring up his prior tax obligation to rebut his alleged lack of knowledge, Roberts's attorney chose to elicit Roberts's testimony regarding the prior obligation in his direct examination. By design, Roberts did not testify as to the precise amount of the previous obligation but stated merely that it was a "significant amount." The government sought to introduce the fact that Roberts owed $2,000,000, and over Roberts's objection, the evidence was admitted.

Roberts contends that the admission into evidence of the amount owed to the government was minimally probative and unduly prejudicial. We do not agree. As Roberts readily concedes, his prior tax liabilities were relevant under Rule 404(b) of the Federal Rules of Evidence. *Huddleston v. United States,* 485 U.S. 681, 685, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988). The amount owed bears directly on one's motive to evade taxes because the larger the obligation, the greater the incentive to avoid payment. Thus, the relevance of the $2,000,000 figure was that it made it more probable that the prior obligation was the result of intentional evasion rather than simple mistake. Describing the amount owed as "significant" could be perceived differently by different people and would do little to clarify whether the liability was the product of deliberate action or inadvertence. We hold, therefore, that the trial court did not abuse its discretion in admitting into evidence the extent of Roberts's prior tax obligation.

■ 3. *Jury Instructions.* Roberts's final claim is that the trial court made two errors of omission in instructing the jury. First, he alleges that the trial court failed to instruct the jury that the presumption of innocence, to which Roberts was entitled, attached to each element of the charge against him. Second, Roberts claims that the trial court erred when it refused to tender a set of proposed instructions advising the jury on how to review evidence provided by coconspirators. A defendant is entitled to an instruction on his theory of the case if he proposes a correct statement of the law, his theory is supported by the evidence, his theory of defense is not part of the charge, and the failure to include an instruction on his theory of defense in the jury charge denied him a fair trial. *United States v. Boykins,* 9 F.3d 1278, 1285 (7th Cir.1993).

Roberts's first allegation of error can be easily disposed of. Instruction # 20, after setting forth the elements of conspiracy to wilfully attempt to evade a tax and wilfully make and subscribe to false tax returns, reads: "If you find from your consideration of all the evidence that each of these elements has been proved beyond a reasonable doubt, then you should find the defendant guilty." It is difficult to see how an instruction could more properly address Roberts's

concerns. We find therefore that Roberts's first claim of error is unavailing.

■ Roberts's second objection to the trial court's jury charge concerns a set of instructions submitted by Roberts but rejected by the court. The instructions in question purport to offer guidance on how the jury ought to treat testimony offered by coconspirators, and in particular Michael Ellis.[2] There is some dispute over whether Roberts properly objected to the trial court's refusal to tender these instructions and therefore whether he is entitled to review under any standard other than plain error. We need not resolve this issue because even under the more lenient standard set forth above, the trial court's refusal to tender these instructions was not erroneous.

Our review of the charge as a whole reveals that the jury was adequately informed as to the potential biases inherent in coconspirator testimony. Instruction # 10 reads: "In determining the credibility of the witnesses, you may take into consideration their interest or lack of interest in the result of this suit...." Instruction # 13 states, "You have heard testimony from a witness who has entered a plea of guilty to a crime arising out of the same occurrence for which the defendants are now on trial.... You may give this testimony such weight as you feel it deserves, keeping in mind that such testimony is always to be received with caution and weighed with great care." Roberts's proposed instructions fail to provide any additional guidance on construing this evidence.

Offering them to the jury would have been redundant. For this reason, we hold that the trial court did not err in refusing to tender these instructions to the jury.

## C. *Douglas Jones*

Doug Jones, one of Hiawatha's premier salespersons, contends that his conviction was the product of multiple errors on the part of the trial court. We find his claims unpersuasive and affirm his conviction.

1. *Prosecutorial Misconduct.* In the course of their investigation of Hiawatha, federal agents conducted a telephone interview with Mark Paton, a former Hiawatha distributor from Aylmer, Ontario. According to the notes of the investigating officer, Paton said that after he had purchased a distributorship from Jones but before he received the machines, Jones asked him to appear on Hiawatha's behalf at upcoming trade shows in Toronto and Montreal. Because the Toronto show predated his receipt and installation of the Hiawatha machines, Paton agreed only to speak in support of Hiawatha's general treatment of him despite Jones's urgings to make loftier representations.

Invoices subpoenaed from Hiawatha's offices revealed later, however, that Paton's machines were in fact installed approximately one week before the Toronto show. To reconcile the discrepancy, government attorneys conducted a second interview with Paton in which he confirmed that the invoice

---

**2.** The proposed instructions read in relevant part as follows:

The testimony of an accomplice or co-conspirator is testimony from a tainted source.

The testimony of accomplices must be scrutinized with great care and caution.

The motives of an accomplice or co-conspirator in testifying, and the circumstances under which his testimony is given, should be considered in determining how much weight and credibility his testimony should be given.

In determining the weight and consideration of the testimony of an accomplice or co-conspirator, you must consider whether there has been any promise to him or indication of favorable treatment for him or actual benefit conferred, promised or indicated by the circumstances of the case.

You are instructed that an accomplice is a person tainted with confessed criminality. He

may have been influenced in his testimony by the strong hope of favor or pardon.

Michael Edward Vincent Ellis is named in the indictment as a co-conspirator. He is not before you as a defendant in this case; nevertheless, by his testimony he is a self-confessed accomplice. An accomplice, when he gives evidence may preclude his telling the truth. In other words he may have reason to lie as to material facts, and it is your duty to give careful consideration to that fact. An accomplice, tainted as he is with a past criminality, is often influenced in his testimony by motives of favor or pardon. Therefore, you must look carefully into any secret motives which might actuate bad minds and victimize the innocent. You are cautioned to scrutinize his testimony with great care and caution.

dates were correct and that his earlier statements had been inaccurate. Subsequent to this interview and in response to Jones's request, the government forwarded summaries of all interviews conducted by FBI agents in this case. Included was a copy of the agent's notes from the first telephone interview with Paton. No communication about the second interview was made.

At trial, Paton, testified on direct that his Hiawatha machines had been installed for approximately one week before his first trade show appearance. Paton was then cross-examined about his earlier contradictory statement. On redirect, the government elicited details about the second interview in which Paton admitted that the prior statement had been incorrect. Claiming that this was the first time he had been informed of this interview, Jones's attorney moved for a mistrial based on the prosecutor's failure to disclose exculpatory information. After the matter was fully argued, the trial judge decided that a mistrial was not necessary and that any prejudice could be corrected by thorough cross-examination.

▮▮▮ Jones argues that the government's failure to disclose Paton's retraction of his first statement was a violation of the prosecution's constitutional obligations under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). More specifically, he claims that the recanted statement was the only evidence of fraud on Jones's part and thus by not disclosing Paton's retraction, the government prevented Jones from adopting the best possible theory of defense. Under the *Brady* doctrine, we inquire as to whether the prosecution withheld exculpatory evidence from the defense and if so whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). Evaluating Jones's claim under this standard, we hold that the government's failure to disclose the substance of Paton's second interview did not rise to the level of a *Brady* violation and

consequently the trial court's refusal to declare a mistrial was not erroneous.

Jones overemphasizes the significance of the date when Paton's machines were installed. The record reveals that Jones asked Paton to claim that each of his machines had a "track record" of earning an average of $30 to $40 per week. Regardless of whether Paton received the machines one week before the trade show or one week after, the fact remains that what Jones asked Paton to say was false. In light of this, Paton's second interview with the government did not produce exculpatory evidence, but served only to clarify a discrepancy in the evidence.

Even if the retraction were exculpatory, the government's failure to forward it to the defense was not so egregious that it rendered the result of the trial questionable. The basis of the *Brady* doctrine is the preservation of a fair trial. *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Here, the evidence which Jones insists was so exculpatory was brought out by the government in its direct examination. The jury was not kept from hearing this evidence. Jones's response is that had he known of the recantation, he would have been able to present a defense that was completely consistent with Jones's innocence. The absurdity of this argument is self-evident. If Jones decided to go to trial based on a theory other than innocence of the crime, his conviction might be justified on the grounds of sheer stupidity. Furthermore, Jones's ignorance of the government's second interview with Paton should not have affected his defense at all. Jones was in possession of the Hiawatha invoices which demonstrated that the machines were installed prior to the Toronto show. Had Paton insisted on his direct that he did not have the machines until after the show, Jones could have offered into evidence the invoices to prove otherwise. Finally, even if Paton's testimony is disregarded, the evidence against Jones was still sufficient for a jury to convict him. Representations which he made to lure persons into purchasing distributorships, particularly in the California sales effort, were completely false and alone could have supported his conviction.

2. *Self-identification.* Some of the government's evidence against Jones was provided by Special Agent Coy of the FBI's office in Dayton, Ohio. Coy had called a toll-free telephone number which Hiawatha had placed in a Dayton newspaper. Coy's call was answered by an answering service operator who took his name and phone number and told him that a salesperson would return his call. Coy left his office and when he returned, he found a message from Doug Jones with directions to contact Jones at the Sheraton Hotel. Coy called the number left by Jones and asked the hotel operator for Jones's room. When his call was connected, the person on the other end identified himself as Doug Jones of Hiawatha. Jones went on to explain Hiawatha's business and to make several promotional representations in support of Hiawatha distributorships. Jones's quotes on distributorship prices, his inflated estimates about the machines' average earnings, and his offer to provide Coy with a list of successful Hiawatha distributors were all typical of the Hiawatha sales pitch. The discussion ended with an agreement to talk again around June 2. On June 3, Jones called Coy and encouraged him to invest. Coy replied that he was not interested at that time.

Jones claims that the trial court admitted Coy's testimony into evidence without properly authenticating the source of the telephone call. He argues that the government failed to meet its burden under Rule 901 of the Federal Rules of Evidence.[3] We review a court's evidentiary decisions for an abuse of discretion. *United States v. Allen,* 930 F.2d 1270, 1273 (7th Cir.1991).

 Jones correctly points out that self-identification by the speaker alone is insufficient to authenticate the source of a telephone call. *United States v. Puerta Restre-*

*po,* 814 F.2d 1236, 1239 (7th Cir.1987). When coupled with the existence of circumstances indicating that the speaker was in fact the person called however, self-identification is adequate. *United States v. Kingston,* 971 F.2d 481, 485 (10th Cir.1992). In *Kingston,* loan investigators tracking down a delinquent account, called the place of business of the debtor company. A representative told the investigators to contact the defendant at a particular number. When contacted, the defendant identified himself and proceeded to discuss the account at issue. The court held that this was sufficient authentication. *Id.* at 485–86.

The circumstances in this case mirror closely those in *Kingston.* The contact with Jones was in response to Coy's call to Hiawatha's listed phone number. Coy was then given a number at which he was told he could reach Jones. When he called the number he asked the hotel operator to be connected to Jones. Jones identified himself and during the conversation made several representations consistent with those he made as a Hiawatha salesperson. These facts support a finding that the person Coy contacted at the Sheraton Hotel was Doug Jones.

3. *Relief from Prejudicial Joinder.* In many of Hiawatha's important sales, including the California effort, Jones was teamed up with another salesperson named Patrick Hall. Although his name was prominently mentioned in the government's case, the jury was unaware that Hall had pleaded guilty to several counts in the indictment until closing arguments when the attorney for one of Jones's codefendants, Thomas Kuebler, informed the jury of Hall's plea. At that point, Jones moved for relief under Rule 14 of the Federal Rules of Criminal Procedure claiming that reference to Hall's plea despite the

---

**3.** Rule 901 reads in relevant part:

(a) **General provision.** The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

(b) **Illustrations.** By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule.

(6) **Telephone conversations.** Telephone conversations, by evidence that a call was made to the number assigned at the time by the telephone company to a particular person or business, if (A) in the case of a person, circumstances, including self-identification, show the person answering to be the one called, or (B) in the case of a business, the call was made to a place of business and the conversation related to business reasonably transacted over the telephone.

lack of any supporting evidence caused undue prejudice to his defense.

Jones claims that his whole theory of defense, including his decision not to testify, was predicated on the fact that no evidence of Hall's plea would be offered. He contends further that the prejudice is borne out by the fact that Jones was acquitted on the one count stemming from a transaction in which Hall was not involved and convicted on the counts in which Hall was involved.

██ If the actual conduct of a codefendant's defense unduly prejudices another defendant, the prejudiced defendant may obtain a severance if he can demonstrate that the joint trial was somehow unfair and not merely that a separate trial would have provided a better chance for acquittal. *United States v. Rollins*, 862 F.2d 1282, 1290 (7th Cir.1988), *cert. denied*, 490 U.S. 1074, 109 S.Ct. 2084, 104 L.Ed.2d 648 (1989). We will only reverse the district court's decision, however, if we find an abuse of discretion. *Id.*

██ We conclude that Jones has failed to demonstrate the requisite degree of prejudice from the remarks made by Kuebler's attorney. Jones neglects to mention that several of the government's witnesses testified as to misrepresentations made by Jones and Hall in their sales pitches. The fact that Jones was convicted on the same counts in which Hall was involved was because the evidence supported that finding not because of the closing remarks. Our conclusion is strengthened by the litany of instructions which cautioned the jury in its task of evaluating the evidence. Instruction #11 stated specifically: "Opening statements, closing statements, and other statements of counsel should be disregarded to the extent they are not supported by the evidence." If the jury missed that instruction, Instruction #13 warned the jury that a "guilty plea is not to be considered as evidence against the defendants." Finally, Instruction #16 stated: "Although the defendants are being tried jointly, you must give separate consideration to each defendant." Jones does not offer any reason for why the jury would have disregarded these instructions.

In light of the evidence linking Hall and Jones to several of Hiawatha's fraudulent activities, and given the court's cautionary instructions, it is not apparent to us that the jury's finding rested on anything other than the evidence against Jones. We conclude, therefore, that the challenged remarks made by Kuebler's counsel in his closing did not warrant severance or other Rule 14 relief.

### III.

By choosing to participate in the Hiawatha venture, the appellants gambled and lost. For the foregoing reasons, the convictions and sentences of Dennis Roberts, Pamela Faught, Bryan Huff, and Doug Jones are

AFFIRMED.