UNITED STATES of America,
Plaintiff–Appellee,

v.

Michael G. WILLIAMS, Hector
Hernandez, and James Kerley,
Defendants–Appellants.

Nos. 92–3313, 92–3346, and 92–3347.

United States Court of Appeals,
Seventh Circuit.

Argued April 7, 1994.

Decided Aug. 3, 1994.

Helene B. Greenwald, Steven Shobat, Barry R. Elden, Asst. U.S. Attys., Debra Riggs Bonamici (argued), Crim. Div., Chicago, IL, for U.S.

Kent R. Carlson (argued), Kent R. Carlson, Chicago, IL, for Michael G. Williams.

C. John Pleban, George A. Kiser (argued), Greenberg & Pleban, Kurt Schultz, St. Louis, MO, for Hector Hernandez.

David S. Mejia, Chicago, IL, for James Kerley.

Before POSNER, Chief Judge, BAUER, Circuit Judge, and TINDER, District Judge.*

BAUER, Circuit Judge.

Michael Williams, Hector Hernandez, and James Kerley were each convicted on one count of conspiracy to possess marijuana with the intent to distribute, 21 U.S.C. § 846, and on two counts of possession of a firearm during and in relation to a narcotics transaction. 18 U.S.C. § 924(c)(1). They appeal various aspects of their convictions. We affirm.

## I.

This all-too-familiar tale of drugs and guns began in July of 1990 when Roberto Sanchez, a confidential informant for the Drug Enforcement Agency ("DEA"), acting on a tip from a friend, sent a letter to Kerley at his home in Elgin, Illinois. In the letter, Sanchez offered to sell cocaine or heroin. When Kerley did not respond to the letter, Sanchez phoned him twice, leaving messages on both occasions. In early October of 1990, Kerley finally returned Sanchez's call primarily to find out how Sanchez knew of him.

Sanchez and Kerley next communicated on October 22, 1990, when Sanchez called Kerley to set up a meeting. The two men met the next afternoon in a restaurant at a nearby gas station. There, Sanchez told Kerley that his source, a man by the name of Julio, had between seventy-five and eighty pounds of marijuana and five and one-half kilograms of cocaine available. Kerley offered to pay $940 per pound of marijuana and $24,500 per kilogram of cocaine. Sanchez said that he would discuss the offer with Julio.

On the next day, Sanchez informed Kerley that a deal was imminent and that Julio wanted to meet Kerley in person. A meeting was scheduled for the next night, October 25, 1990, at a restaurant in Schaumburg. At that meeting, Domingo Alvarez, another DEA informant, posed as Julio. Kerley arrived with his friend and eventual codefendant, Hernandez. Negotiations were conducted primarily in Spanish between Alvarez and Hernandez. Alvarez initially offered to sell twenty pounds of marijuana and five and one-half kilograms of cocaine. After discussing it between themselves, Kerley and Hernandez told Alvarez that they were interested only in the marijuana. Alvarez then left, ostensibly to confirm the terms of the deal with his source. When he returned, he informed the defendants that his source had as much as 150 pounds of marijuana available. Hernandez then went to make a phone call to verify that he could resell the marijuana at $1,400 per pound. Upon his return, he and Kerley agreed to buy all 150 pounds of marijuana for a total price of $120,000. The parties decided to carry out the transaction on the following afternoon at Kerley's garage. Before he left, Kerley intimated to Alvarez that he might still be interested in purchasing the cocaine.

On the morning of the scheduled deal, Hernandez and two other acquaintances, Michael Williams and Michael King, met at Williams's house to collect the money. The money was packaged in a black bag and placed in the trunk of King's car. The three men then drove, in King's car, to Kerley's garage. Williams and King dropped Hernandez off and went to get lunch for the four men.

Rafael Tovar, an undercover narcotics officer posing as Alvarez's accomplice "Bato", arrived at the garage at approximately 12:15 p.m. Tovar told Kerley and Hernandez that

---

* The Honorable John D. Tinder, United States District Judge for the Southern District of Indiana, is sitting by designation.

he did not have the drugs with him but that he was there to make sure everything was ready. Kerley repeated to Tovar his desire to resell the marijuana and use the proceeds to purchase the cocaine. Tovar insisted on seeing the money before any further deals were made.

Williams and King had just returned from lunch. King brought over to Tovar the bag containing the money. Satisfied with its contents, Tovar asked where the defendants wanted to take delivery of the marijuana. Williams and Kerley suggested Tovar bring it to the garage. Tovar proceeded to his car, ostensibly to call his associates who had the drugs, but in reality to call in surveillance agents to make the arrest.

Tovar went back to the garage and made small talk while waiting for the agents to arrive. Upon their arrival, Williams, in a futile attempt to flee, was seen reaching for something inside his jacket near his waist, but he was apprehended before he could retrieve the object. A search of his person revealed a loaded .38 caliber Walther handgun tucked in the waist of his pants. Police also discovered a second loaded handgun, a nine millimeter Beretta traced to Hernandez, along with additional ammunition. The Beretta was found on a heater within reach of where Hernandez and Kerley were standing prior to their arrest.

King pleaded guilty to one count of conspiracy to possess, with the intent to distribute, a controlled substance. Williams pleaded guilty to unlawful possession of a firearm by a previously convicted felon. 18 U.S.C. § 922(g)(1). Williams, Hernandez, and Kerley were each indicted on one count of conspiracy to possess with the intent to distribute 150 pounds of marijuana and two counts of using and carrying a handgun during and in relation to a drug trafficking offense. They proceeded to trial and were convicted on all three counts. Hernandez and Kerley each received prison sentences totalling 101 months; Williams was sentenced to a total term of 106 months.

## II.

Williams, Hernandez, and Kerley challenge, individually and jointly, various as-

pects of their convictions. We turn our attention to each of their claims serially.

### A. Sufficiency of the Evidence

■ The defendants contend that the evidence supporting their convictions on all three counts was insufficient as a matter of law and ask that we either reverse the convictions outright or that we remand the case for a new trial. Challenges to the sufficiency of evidence are considered using a familiar standard; reviewing the evidence in a light most favorable to the government, we must determine whether a rational trier of fact could have found beyond a reasonable doubt, the essential elements of the charged crime. *United States v. Donovan,* 24 F.3d 908, 913 (7th Cir.1994).

■ Williams, Hernandez, and Kerley first claim that the evidence failed to establish that a conspiracy, as charged in Count I, in fact existed. A conspiracy is an agreement between two or more persons to commit a criminal act. *United States v. Roberts,* 22 F.3d 744, 748 (7th Cir.1994). To prove a conspiracy to possess illegal narcotics with the intent to distribute, the government must demonstrate the existence of such an agreement, that the defendants knew of the agreement, and that the defendants intended to join it. *Donovan,* 24 F.3d at 913.

The defendants contend the evidence pertaining to the quantity of marijuana transacted demonstrated a confusion that undermined a finding of an agreement involving 150 pounds. Testifying on behalf of the government, King stated that he believed the transaction was for seventy-five pounds of marijuana. According to the defendants, that King's belief was indeed true was borne out by the fact that they only brought $98,000 to Kerley's garage, a sum too low to purchase 150 pounds of marijuana.

■ The quantity of drugs is not an essential element of the crime as long as the jury finds that a "measurable amount" was involved. Once this is found, the exact quantity involved is only a sentencing issue. *United States v. Acevedo,* 891 F.2d 607, 611 (7th Cir.1989). Hence, any discrepancies

concerning the quantity to be sold would be relevant only if such confusion made it so that no rational trier of fact could find a sufficiently definite agreement. The evidence in this case does not present us with such a situation.

Alvarez's testimony confirms that while the parties initially contemplated a transaction for less than 150 pounds, when they left the restaurant in Schaumburg, Alvarez and Sanchez had reached an agreement to sell to Hernandez and Kerley 150 pounds of marijuana for $120,000. Tovar testified that he also understood the transaction to be for 150 pounds. To the extent that King's testimony conflicted with this, the jury had to make a credibility determination, and the defendants cannot persuade us that no rational trier of fact would have believed Alvarez over King especially since King was absent from the meeting.

We also find unpersuasive the claim that because the defendants brought only $98,000 in cash to the meeting, the existence of an agreement was rendered doubtful. If anything, the money reinforces the conclusion that the defendants did in fact agree to purchase a sizeable amount of narcotics. People generally do not collect, package, and carry $98,000 in cash unless they are about to consummate a transaction of some sort. Moreover, as Tovar testified, the drug trade does not attract the most honest of participants and it is not uncommon for participants to bring less than the agreed-upon amounts of money or drugs. A jury could have quite reasonably inferred either that the defendants were trying to pressure the sellers into lowering the price further or that they simply could not come up with all the money. Neither conclusion disproves the existence of an agreement to buy and sell a measurable amount of narcotics, and, therefore, the evidence is sufficient to support the jury's findings.

The defendants also dispute the validity of their convictions for using and carrying firearms during and in relation to a drug trafficking offense. They argue that the evidence fails to link the guns to the conspiracy.

Our analysis begins with the Supreme Court's decision in *Pinkerton v. United States*, 328 U.S. 640, 647, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946). In that case, the Court held that an act in furtherance of a conspiracy can be attributed to all coconspirators regardless of whether those coconspirators participated in the act. *Pinkerton* may be used to impute a firearm violation under 18 U.S.C. § 924(c) to other conspirators. *United States v. Allen*, 930 F.2d 1270, 1275 (7th Cir.1991). An exception to this rule exists when the offense "could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement." *Pinkerton*, 328 U.S. at 648, 66 S.Ct. at 1184.

The defendants contend that their case qualifies under this exception. Hernandez and Kerley claim to have had no knowledge that either of the guns were on the scene. With respect to the Walther found on his person, Williams argues that he carried it at all times and that it was unrelated to the transaction.

Because the drug industry is, by nature, a violent business, the presence of firearms in transactions involving sizeable quantities of drugs is reasonably foreseeable. In *United States v. Diaz*, 864 F.2d 544, 549 (7th Cir.1988), we held that in a transaction involving $39,000, it was perfectly reasonable to assume a weapon would be carried. Similarly, in *United States v. Gutierrez*, 978 F.2d 1463, 1468 (7th Cir.1992), where the defendants were selling $60,000 worth of cocaine, it was foreseeable that one of them would bring a gun to the transaction. In both cases, one conspirator's possession of a gun was attributable to another conspirator for purposes of a conviction under 18 U.S.C. § 924(c).

We fail to see how this case differs from *Diaz* and *Gutierrez*. In fact, since the value of this transaction exceeds the combined value of the deals in those two cases, one would suspect a more heightened probability of weapons. The defendants do not explain why this deal was to be uniquely peaceful. Moreover, the jury simply could have concluded that the defendants deliberately brought guns to the garage to facilitate the deal. The evidence showed that Williams

reached for his weapon when the police arrived. As for the second gun, testimony at trial established that Hernandez frequently left it with Kerley at the garage and that when the arrest was made, the gun was not in its usual storage space, but instead, lay hidden from view within the reach of Hernandez and Kerley. Based on this evidence, the jury could have plausibly rejected the notion that the weapons were not carried to aid the transaction.

### B. Prior Bad Acts Evidence

Testifying as to the events which transpired at the meeting on the night before the ill-fated deal, Alvarez stated that Hernandez claimed to have imported a "ton of marijuana" from Mexico and offered Alvarez assistance in future smuggling operations. Hernandez contends that this evidence was inadmissible under Rule 404(b) of the Federal Rules of Evidence.[1]

Hernandez is correct in his interpretation of Rule 404(b). Evidence of prior wrongdoing cannot be used to show the character of a person to prove action in conformity therewith. He is wrong, however, in his application of the rule to his case.

Evidentiary rulings will be overturned upon a showing of an abuse of discretion. This is satisfied by demonstrating that no reasonable person could take the view of the trial court. *United States v. Hilgeford*, 7 F.3d 1340, 1345 (7th Cir.1993). Evidence admitted over a Rule 404(b) objection must satisfy a four-part test. First, the evidence must be relevant to prove something other than character. Second, the act in question must be similar in nature and close in time to the crime. Third, the evidence of the prior act must be reliable. Finally, the probative value of the evidence must outweigh any undue prejudice caused by its admission. *United States v. Goodapple*, 958 F.2d 1402, 1406 (7th Cir.1992). Hernandez asserts that permitting Alvarez to testify as to Hernandez's alleged prior smuggling activities did not meet the first of these criteria.

This court discussed the admissibility of similar evidence in *United States v. Goodapple, Id.* The defendant in *Goodapple* objected to testimony from the government's informant regarding prior drug transactions between him and the defendant. We held that because the defendant raised an entrapment defense, evidence of prior bad acts was admissible under Rule 404(b) to prove the defendant's predisposition. *Id.* We added that the evidence was also probative of the defendant's specific intent to distribute. *Id.* at 1407. *See also United States v. Parkin*, 917 F.2d 313, 316 (7th Cir.1990) (prior drug transactions admissible to prove intent and predisposition in subsequent drug offense).

Under the standard set forth in *Goodapple*, Hernandez's statements were properly admitted. The record reveals that from the opening statement on, all three defendants were relying on an entrapment defense. In the event the jury did not accept this argument, Hernandez, individually, also advanced the theory that his role was solely to act as a Spanish interpreter for Kerley. He argued that the absence of criminal intent on his part required an acquittal. Hernandez's statements about prior drug smuggling were admissible to rebut both these defenses. They demonstrated that Hernandez was more than just a stooge unwittingly caught in an overly zealous law enforcement sting operation. Hernandez's statements and his offer to assist Alvarez in future operations suggest that he was actively seeking to secure credibility and gain favor with Alvarez. Were he truly an innocent party, there would be no need for such representations. The trial court, therefore, properly admitted the statements into evidence.

### C. Motion for Severance

Kerley claims that his case should have been severed from that of his codefendants because, in a separate trial, his codefendants would have testified that Kerley had no

---

1. Rule 404(b) reads in relevant part:
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, participation, plan, knowledge, identity, or absence of mistake or accident. . . .

**528**

knowledge that either gun was present at the scene of the crime.

 The efficiencies involved in trying members of the same conspiracy together has led to a presumption in favor of a joint trial for coconspirators. *United States v. Lopez,* 6 F.3d 1281, 1285 (7th Cir.1993). Rebuttal of this presumption is governed by Rule 14 of the Federal Rules of Criminal Procedure.[2] To obtain a severance in order to take advantage of exculpatory evidence, Kerley must show that (1) the codefendant's testimony would be exculpatory, (2) the codefendant would in fact testify, and (3) the testimony would bear on the defendant's case. *United States v. Boykins,* 9 F.3d 1278 (7th Cir.1993).

 Kerley fails to meet the first prong of this test. To adequately demonstrate that in a separate proceeding Kerley would avail himself of exculpatory testimony, he must provide independent support of that testimony. *United States v. Studley,* 892 F.2d 518, 525 (7th Cir.1989). He has not done so. Furthermore, even if he had provided us with such support, the evidence would not have been truly exculpatory. As we have stated, each member of a conspiracy is responsible for the acts of coconspirators which have the effect of furthering the conspiracy and are reasonably foreseeable. The use of firearms in a drug transaction anticipated to involve over $100,000 is reasonably foreseeable. Testimony by Hernandez or Williams to the effect that they believed Kerley was ignorant of the two guns would not make it any less foreseeable. Nor would it completely exonerate Kerley. At best, it would establish only that Hernandez and Williams believed Kerley to be ignorant of the guns.

### D. Rule 16 Discovery

 We can easily dispose of Kerley's next claim. He contends that the informant, Sanchez, testified that he kept notes of his conversations with Kerley. Kerley alleges that despite his requests for all written state-

ments made by the defendant, the government failed to turn over these notes. Suspecting that these notes might contain exculpatory material, Kerley requested that the trial court order the government to turn them over. The trial court denied his request, and Kerley appeals.

Kerley's claim rests on a misunderstanding of the proceedings below. Our review of the record reveals no basis for the belief that these notes did in fact exist. Sanchez testified only that when he conversed with Kerley or anyone in his capacity as an informant, he noted that he did so and told the police. Nothing in his testimony suggests the existence of "written or recorded statements made by the defendant" as described by Rule 16. At trial and on appeal, the government has maintained that everything to which the defendants were entitled was provided. We find no evidence to the contrary and, hence, we agree with the trial court's disposition of this matter.

### E. Improper Closing Remarks

 In its rebuttal to the defendants' closing arguments, the attorney for the government made the following statement to the jury: "[B]efore I get into the specifics I want to preface it with, use your common sense. Evaluate all the evidence you get and don't let them pull a fast one on you." Defense counsel objected, arguing that the remark, "pull a fast one on you" was a personal attack on the attorneys. After assuring the court that this was not the intended meaning, the government attorney was instructed to clarify his intent for the jury. Over the objection of the defendants, who wanted the remark stricken, counsel explained to the jurors that his remark was merely intended to convey his belief that for them to find in favor of the defendants, they would have to draw inferences which run counter to common sense. Contending that the statement was sufficiently prejudicial to render the trial unfair, the defendants request a new trial.

 Prosecutorial remarks can provide a basis for a new trial only if the re-

---

**2.** Rule 14 provides:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

marks were improper and so infected the entire trial with unfairness so as to render the conviction a denial of due process. *United States v. Goodapple,* 958 F.2d 1402, 1409 (7th Cir.1992). The statement at issue here falls well short of this standard. Comments as to the credibility of witnesses and reasonableness of inferences are permissible so long as they are in fact based on the evidence and not on the attorney's personal opinion. The prosecution may go so far as to call the defendant a liar if the evidence supports such an inference. *Id.*

In this particular instance, the government was responding to the defense of entrapment and attempting to cast doubt on the conclusion that Kerley was unwittingly goaded into this transaction. The attorney made reference to the wealth of evidence which suggested that Kerley was very interested in purchasing not only the marijuana but the cocaine as well. Considered in the context of the government's argument, it is clear that the challenged remark was a comment on the evidence, not on the defense attorneys, and was, therefore, not improper.

### III.

For all of the foregoing reasons, the convictions of Michael Williams, Hector Hernandez, and James Kerley are

AFFIRMED.