**UNPUBLISHED ORDER**
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

Submitted December 7, 2006
Decided December 8, 2006

**Before**

Hon. MICHAEL S. KANNE, *Circuit Judge*

Hon. TERENCE T. EVANS, *Circuit Judge*

Hon. DIANE S. SYKES, *Circuit Judge*

No. 06-1319

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee,* | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. |
| *v.* | |
| | No. 02-CR-35-3 |
| DAVID DIAZ, *Defendant-Appellant.* | Joan Humphrey Lefkow, *Judge.* |

**O R D E R**

David Diaz was convicted of conspiring to possess and distribute cocaine, *see* 21 U.S.C. §§ 846, 841(a)(1), possessing cocaine with intent to distribute, *see id.* § 841(a)(1), and carrying a gun during and in relation to a drug trafficking crime, *see* 18 U.S.C. § 924(c)(1)(A)(i).  Diaz pleaded guilty to the two drug charges and was found guilty on the gun charge after a bench trial; the district court sentenced him to a total of 120 months' imprisonment.  Diaz filed a notice of appeal, but his newly appointed counsel now moves to withdraw on the basis that he cannot discern a nonfrivolous basis for appeal.  *See Anders v. California*, 386 U.S. 738 (1967).  Diaz has not accepted our invitation to respond to counsel's submission, *see* Cir. R. 51(b), so our examination is confined to those potential issues identified in counsel's facially adequate brief, *see United States v. Tabb*, 125 F.3d 583, 584 (7th Cir. 1997) (*per curiam*).

Diaz was indicted on the drug and gun charges after he was arrested for participating in a drug deal that took place in the Logan Square neighborhood of Chicago, Illinois. Although he initially pleaded not guilty to all three charges, he eventually entered open guilty pleas to the two drug charges and opted for a bench trial on the gun charge. At trial, the government presented the following evidence detailing Diaz's role in the drug transaction:

In December 2001 a paid informant contacted Joel Castaneda to purchase seven kilograms of cocaine; Castaneda told the informant he could provide the cocaine after he obtained it from his own drug supplier, Diaz. Over the course of about a month, the informant spoke with either Diaz or Castaneda over the telephone to negotiate the deal. During the negotiations Castaneda told the informant that, because of an attempted kidnapping and "rip-off" during an earlier drug deal, he and Diaz planned to prevent a similar episode by hiring "security people" to oversee their drug deal. According to the informant, Castaneda described the "security people" as "idiots guarding with the guns." A deal was struck for Diaz and Castaneda to deliver seven kilograms of cocaine to the informant in exchange for approximately $147,000. The transaction was to occur incrementally throughout one day, with only two to three kilograms being delivered at a time.

On the agreed day for the transaction, the informant met Castaneda in a shopping center parking lot. When the informant entered Castaneda's car, Castaneda displayed a 9mm handgun. Castaneda also pointed out that a man sitting in a car parked in the adjoining space was acting as armed security for the deal; that man would later be identified as Aureo Almazan. After undercover agents handed over the $147,000 for the entire seven kilograms of cocaine, Castaneda told the informant that he and Diaz "were going to try to get at least two" kilograms for the first stage of the transaction. He then departed to retrieve the cocaine, and Almazan drove off as well.

About two hours later, Diaz, Castaneda, and Almazan returned to the parking lot in a car driven by Diaz. When Diaz showed the informant one kilogram of cocaine, federal agents moved in and arrested the three men. A search of the car revealed a hidden compartment containing an additional kilogram of cocaine and several 9mm hollow-point bullets; the bullets matched the hollow points loaded in the handgun recovered from Castaneda. Agents also seized a 9mm handgun from Almazan.

Castaneda and Almazan testified for the government that Diaz knew they would be armed at the drug deal. In fact, Almazan recounted that Diaz himself gave Almazan the 9mm handgun he carried to the deal. Castaneda added that he and Diaz had agreed that they should be armed at the deal, and that Diaz provided him with bullets for his handgun.

The court found Diaz guilty, reasoning that the government had failed to prove beyond a reasonable doubt that Diaz himself had toted a gun, but did establish that he was guilty under *Pinkerton v. United States*, 328 U.S. 640 (1946), because it was reasonably foreseeable that his coconspirators would be armed. Diaz challenged this conclusion in a posttrial motion for a judgment of acquittal. He argued, in essence, that the evidence failed to establish beyond a reasonable doubt that he could reasonably foresee that his coconspirators would be armed at the drug deal. The district court denied the motion.

In her presentence investigation report, the probation officer advised the district court that the government had "concluded" that Diaz "should be held accountable" only for the two kilograms of seized cocaine even though there had been "an initial agreement" between the informant and Castaneda "that seven kilograms of cocaine would be delivered." In calculating the guidelines imprisonment range for the drug counts, the probation officer utilized the two-kilogram figure in selecting a base offense level of 25. *See* U.S.S.G. § 2D1.1(c)(6). There were no adjustments, so the resulting total offense level of 28 yielded an imprisonment range of 78 to 97 months given Diaz's Category I criminal history. Diaz was also subject to a mandatory, consecutive term of 60 months for his gun conviction. *See* 18 U.S.C. § 924(c)(1)(A)(i); U.S.S.G. § 2K2.4(b).

At the sentencing hearing, Diaz made several objections to the calculation of the guidelines range, which the district court overruled. The court then adopted the recommended 78- to 97-month range, accepting the government's "conclusion" that Diaz should be held accountable for conspiring to sell only two kilograms of cocaine, and not seven. Despite this break, Diaz argued that a sentence below the range was appropriate to avoid what he characterized as an unwarranted disparity between his sentence and the sentences of his coconspirators, Castaneda and Almazon, who received 70 and 78 months, respectively. The district court agreed, and on both drug counts imposed the minimum mandatory sentence for a drug offense involving two kilograms of cocaine—60 months' imprisonment—to run concurrently. *See* 21 U.S.C. § 841(b)(1)(B)(ii)(II). To this the court added the mandatory consecutive 60-month term on the gun count, for a total of 120 months.

Counsel informs us that Diaz contends that his trial lawyer coerced his guilty pleas, so counsel first considers whether Diaz could argue that his pleas were involuntary. *See United States v. Knox*, 287 F.3d 667, 670-71 (7th Cir. 2002). A district court ensures that a defendant's guilty plea is knowing and voluntary by complying with the requirements of Fed. R. Crim. P. 11, and because Diaz did not move to withdraw his guilty pleas in the district court, we would review the district court's compliance with Rule 11 for plain error. *See United States v. Vonn*, 535 U.S. 55, 59 (2002). We agree with counsel that the district court meticulously complied with Rule 11. As pertinent here, the court asked Diaz under oath (after explaining

the ramifications of false statements) whether he understood that he had the right to plead not guilty, to which he responded "yes," and whether anyone—including his attorneys—had threatened him or forced him to plead, to which he stated "no." *See* Fed. R. Crim. P. 11(b)(1)(B), (b)(2). The court also inquired whether Diaz was satisfied with trial counsel and the advice he received, and Diaz responded "yes." Indeed, Diaz's lead trial attorney requested that the court ask Diaz specifically whether he was satisfied not only with lead counsel's performance, but also with the performance of co-counsel; Diaz again responded "yes." *See Bridgeman v. United States*, 229 F.3d 589, 592 (7th Cir. 2000) ("[Defendant's] argument that his counsel's advice rendered his plea unwitting and involuntary is belied by his own statements at the change of plea hearing, which are presumed truthful."). Because the district court substantially complied with Rule 11 in all other material respects, we agree with counsel that it would be frivolous for Diaz to challenge on appeal the voluntariness of his guilty pleas. *See United States v. Schuh*, 289 F.3d 968, 974 (7th Cir. 2001).

Counsel next examines whether Diaz could challenge the denial of his posttrial motion for a judgment of acquittal on the ground that there was insufficient evidence to support a conviction on the gun count under *Pinkerton*. Our review would be *de novo*. *See United States v. Macari*, 453 F.3d 926, 936 (7th Cir. 2006). Under *Pinkerton*, Diaz could be found guilty of violating § 924(c) so long as it was reasonably foreseeable to him that Castaneda or Almazan would be carrying guns during and in relation to the drug deal. *See United States v. McLee*, 436 F.3d 751, 758 (7th Cir. 2006); *United States v. Chairez*, 33 F.3d 823, 826-27 (7th Cir. 1994). And because the "possession of weapons is all too common in the course of drug dealing," *United States v. Allen*, 930 F.2d 1270, 1275 (7th Cir. 1990), we have held that the presence of firearms is reasonably foreseeable at drug deals involving large amounts of drugs and money, *see United States v. Williams*, 31 F.3d 522, 526 (7th Cir. 1994); *United States v. Gutierrez*, 978 F.2d 1463, 1468 (7th Cir. 1992).

Here, the evidence was more than sufficient to support a finding that it was reasonably foreseeable to Diaz that his cohorts would be armed at the drug deal. Castaneda testified at trial that he told Diaz a week before the drug transaction that he would be armed during the deal, and that Diaz gave him bullets for his handgun. This testimony was corroborated by the 9mm hollow-point bullets found in the hidden compartment of Diaz's car. Moreover, Almazan testified that he got his gun from Diaz. That is enough to sustain the verdict, but even ignoring the accomplice testimony, the large sum of money that was involved in the deal for the seven kilograms of cocaine—$147,000—alone makes the presence of firearms reasonably foreseeable. *See Williams*, 31 F.3d at 526 (holding that presence of firearms at drug deal involving $98,000 worth of cocaine was reasonably foreseeable); *Gutierrez*, 978 F.2d at 1468 ("The defendants agreed to sell two kilograms of cocaine for $60,000; therefore, it was reasonably foreseeable that a gun

would be carried in relation to the illegal transaction."). Thus it would be frivolous for Diaz to argue that the district court erred by denying his motion for a judgment of acquittal.

Finally, counsel contemplates whether Diaz could argue that his overall prison sentence is unreasonable. *See United States v. Booker*, 543 U.S. 220 (2005). But Diaz was sentenced to the mandatory minimums for his drug and gun convictions, *see* 21 U.S.C. § 841(b)(1)(B)(ii); 18 U.S.C. § 924(c)(1)(A)(i), and "*Booker* does not permit district judges to disregard mandatory minimum sentences," *United States v. Miller*, 450 F.3d 270, 275 (7th Cir. 2006); *see United States v. Lee*, 399 F.3d 864, 866 (7th Cir. 2005) ("Nothing in *Booker* gives a judge any discretion to disregard a mandatory minimum.").

Moreover, we note that Diaz benefitted greatly from the district court's finding that the drug conspiracy involved only two kilograms of cocaine—and not seven. The drug quantity under § 841(b) for a conspiracy is the amount negotiated, not the amount actually delivered, *see United States v. Muniz*, 49 F.3d 36, 39 (1st Cir. 1995); *United States v. Pion*, 25 F.3d 18, 24-25 & 25 n.12 (1st Cir. 1994); *United States v. Hughes*, 970 F.2d 277, 236-37 & 236 n.9 (7th Cir. 1992), and for seven kilograms of cocaine the minimum mandatory prison sentence is 10 years, *see* 21 U.S.C. §§ 846, 841(b)(1)(A)(ii)(II), not the five-year minimum term that the district court imposed, *see id.* §§ 846, 841(b)(1)(B)(ii)(II). Our review of the record shows that Diaz and his cohorts agreed to sell the informant a total of seven kilograms of cocaine incrementally throughout one day, not just the two that were delivered initially. We thus fail to understand how the government could have "concluded" that the drug quantity was two kilograms. *See Muniz*, 49 F.3d at 40; *Pion*, 25 F.3d at 24-25 & 25 n.12; *Hughes*, 970 F.2d at 236-37 & 236 n.9. But since the district court accepted this conclusion and saved Diaz from, at the very least, an additional five years in prison, *compare* 21 U.S.C. § 841(b)(1)(A)(ii)(II), *with id.* § 841(b)(1)(B)(ii)(II), it would be particularly frivolous for him to challenge the reasonableness of his sentence.

Accordingly, the motion to withdraw is GRANTED, and the appeal is DISMISSED.