UNITED STATES of America,
Plaintiff–Appellee,

v.

Thomas J. MALONEY, Defendant–
Appellant.

No. 94–2779.

United States Court of Appeals,
Seventh Circuit.

Argued June 8, 1995.

Decided Nov. 29, 1995.

Barry Rand Elden, Chief of Appeals, Mark Filip (argued), Office of U.S. Attorney, Chicago, IL, for U.S.

Jeffrey N. Cole (argued), Andrew T. Staes, Cole & Staes, Chicago, IL, for Thomas Maloney.

Before CUMMINGS, ESCHBACH, and RIPPLE, Circuit Judges.

ESCHBACH, Circuit Judge.

This is yet another in an unfortunately long line of public corruption cases which have left a blot on the escutcheon of Chicago justice. Thomas J. Maloney, a former judge in the Circuit Court of Cook County, appeals from his conviction on charges of racketeering conspiracy, racketeering, extortion under color of official right, and obstruction of justice, in violation of 18 U.S.C. §§ 1962(d), 1962(c), 1951, and 1503, respectively, in connection with his taking bribes in cases before him. Among his many grounds for appeal,

Maloney contends that he should have been granted a new trial due to the government's failure to disclose improper benefits bestowed upon two "El Rukn" witnesses. The district court denied Maloney's motion, finding that further impeachment of these witnesses would not have changed the outcome. We affirm.

## I.

Thomas Maloney assumed his position on the bench in 1977 and remained there until his retirement in 1990. According to the jury's findings, during that time he took bribes and agreed to "fix" four cases,[1] including three murder cases, and obstructed justice in relation to the investigation of these bribes. Generally, these bribes were accomplished through the use of a "bagman," or intermediary between the lawyer desiring the fix and the judge. Maloney used a bailiff, Lucius Robinson, as his bagman until Robinson's reputation became a liability during the "Greylord" investigation of Chicago judges. Maloney then switched to Robert McGee, who practiced law with Maloney from 1973 until 1977.[2]

The first bribe charged in the indictment occurred in May 1981. Attorney Robert Cooley was contacted by First Ward Alderman Fred Roti and Ward Secretary Pat Marcy to represent Lenny Chow, a hit man for the On Leong crime organization, and two others who were charged with attempted murder for shooting William Chin in Chicago's Chinatown. An On Leong representative, William Moy, told Cooley he wanted a guaranteed not guilty verdict. The case was before Judge Maloney and Marcy assured Cooley that the Judge could be bought, but warned him that Judge Maloney "wants a lot of money on this one." Moy agreed to pay $100,000, a portion of which Marcy gave to Maloney as part of the fix. Chin died, however, and the charges were elevated to murder. Despite this, Marcy was able to get Judge Maloney to allow the prior bond to

stand as long as a friend of Judge Maloney joined as co-counsel. At trial, Judge Maloney admitted a dying declaration, but found it unreliable, thus acquitting the defendants. Tapes of a conversation between Cooley and Marcy made after Cooley became an informant confirmed the existence of the fix.

The government introduced evidence of another bribe which was not charged in the indictment, but occurred during this period, to demonstrate Judge Maloney's membership in the conspiracy. In 1980, William Swano represented Wilfredo Rosario in a double murder case before Judge Maloney. The critical evidence against Rosario was his confession. When Swano was discussing this case with Lucius Robinson, Robinson indicated he could arrange a fix with Judge Maloney for between $2,000–$2,500. Doubtful, Swano asked that a personal meeting be arranged. At this brief meeting outside his chambers, Judge Maloney told Swano that Robinson is "my guy, deal with him," whereupon, in Maloney's presence, Swano allegedly handed Robinson a white envelope with a portion of the bribe. In 1981, Judge Maloney suppressed the confession and found Rosario not guilty.

Swano, Robinson and Judge Maloney continued this arrangement for a few years. In 1982, Swano represented Ronald Roby in five deceptive practices cases which he had consolidated before Judge Maloney. Although the total dollar amount was small, Roby feared that he would be imprisoned because of his prior conviction for a similar offense in 1980. Thus, Swano sought out Robinson to arrange a fix which would guarantee no prison time. Roby testified that a bribe was to paid out of his $5,000 "fee." During a plea conference, Maloney sentenced Roby to probation with work release on Sundays and Mondays. Soon after, according to Robinson's testimony, he passed along $2,300 to Judge Maloney at a McCormick Place lounge Maloney had suggested as a meeting place.

---

1. A fifth bribe was charged in the indictment, but the jury did not find that this bribe was committed.

2. McGee was Maloney's co-defendant in this case and was convicted on all counts charged against

him. His case, however, is not the subject of this appeal and we make no comment about the correctness of the verdict or the sentencing as it applied to him.

Robinson also testified that a few days later, while riding alone with Judge Maloney in the judges' elevator, Maloney gave him $200–$300 for his work as a bagman on the case.

The third bribe charged in the indictment occurred in late 1982. Owen Jones was charged with felony murder after beating a man to death with a pipe during a burglary. Swano was hired and explained the details of the case to Robinson in hopes of securing a fix. A few weeks later, however, when Swano went to court for the Jones case, Robert McGee approached him and explained that Robinson had become "too hot" to serve as a bagman for Judge Maloney anymore. Thus, Maloney asked McGee to take over. McGee told Swano that the best the Judge would do on the Jones case would be to acquit on felony murder, convict on voluntary manslaughter and impose a nine year sentence. Agreeing that this was preferable to a likely twenty year sentence for felony murder, Jones' mother agreed to pay Swano $4,000–$5,000 for the fix. After trial, Jones was found guilty of voluntary manslaughter and sentenced to nine years.

The final bribe charged in the indictment took place a few years later. In June 1985, Earl Hawkins and Nathan Fields, members of the El Rukns, were charged with murdering two men. Judge Maloney was assigned the case and Swano represented Hawkins. Swano assured Hawkins that he could win a decision in his favor in a bench trial if Hawkins could raise enough money for the Judge. Hawkins referred him to Alan Knox, a "senior" El Rukn general, who approved the fix. Swano testified that he met with McGee in January or February of 1986 to discuss the fix and they arrived at a figure of $10,000. According to Swano, McGee talked with Maloney and confirmed the figure, but McGee told Swano that the fix was conditional upon Swano putting on a "a good case" so Judge Maloney would not look bad. Swano then informed the El Rukns that the bribe was on, although he padded the figure to $20,000 to ensure some money for himself. He had some difficulty, however, collecting the bribe money from the El Rukns. Finally, the morning of trial, surveillance records indicate Swano left court and went to the El Rukn headquarters to get the money, and that Knox later arrived at the courthouse with a bulge in his pocket which appeared to be a roll of bills. Swano called McGee to confirm the fix and gave him a file folder with the money at the Mayor's Row restaurant. The case proceeded to a bench trial. On June 17th and 18th, the State put on its case where three eyewitnesses identified Hawkins as the murderer. By this time, the FBI had become suspicious of Judge Maloney and Hawkins/Fields case, and its agents were watching the trial closely. This attention, coupled with the strength of the State's case, prompted Judge Maloney to have second thoughts. Thus, McGee called Swano at 11:23 a.m. on June 19th in the anteroom outside Judge Maloney's chambers to inform him that he needed to "give the books back that he had given him the other day." Swano, hoping to salvage the fix, told McGee to "hold onto the books" at least until the defense could put on its case. According to Hawkins' testimony, Swano came back from the Judge's chambers and told him that Judge Maloney had returned the bribe money. Swano testified, however, that he had in fact persuaded McGee to talk to Judge Maloney about continuing the fix and was, at least temporarily, successful. Swano also testified that he confirmed the existence of the fix with Judge Maloney himself on two occasions. By the end of trial on June 26th, though, Judge Maloney apparently believed that Swano had not lived up to his end of the bargain by putting on a good defense case. McGee called Swano on the evening of the 26th to inform him the fix was off. The next morning Maloney told Swano that a lawyer had left a file for him in his chambers and directed a deputy sheriff to retrieve it. When Swano went to the Judge's chambers, Maloney handed Swano the file of money he had passed to McGee at the start of the trial. Hawkins and Fields were found guilty by the Judge and subsequently sentenced to death.

By at least May 1988, a grand jury proceeding was convened and Robinson, under a grant of immunity, testified about judicial bribery in general and Maloney in particular. No indictments had yet been handed down, however, and Swano continued to practice before Judge Maloney. In late 1988 or early

1989, Swano had a pretrial case conference with the Judge in his chambers. After everyone else had left, Judge Maloney asked Swano "whether or not [he] was standing tall," which Swano understood to mean was he resisting the questions of federal investigators. Judge Maloney also asked Swano if he "needed a lawyer or any sort of help." In the Summer of 1990, in a back stairway of the courthouse, Judge Maloney again asked Swano if he was "standing tall," because he had "heard that there is a lot of investigation going on." During the conversation, Swano told Maloney that he understood the government was trying to put together a tax case against him.

On June 26, 1991, Maloney was indicted by a federal grand jury and the case proceeded to trial in March 1993. The defense's theory was that Swano and Robinson had operated a scam known as "rainmaking," where the participants never pass the bribe along to the judge. The government, however, rebutted this theory with evidence of Maloney's financial records which indicated that he extensively used money orders to hide the fact that he was spending more money than he received from all legitimate sources. On April 16, 1993, the jury convicted Maloney on all counts.

After the verdict was reached in this case, three separate district judges in the Northern District of Illinois held that William Hogan, one of the prosecutors in this case, had suppressed material information in the cases before them and ordered new trials. *See United States v. Boyd*, 833 F.Supp. 1277 (N.D.Ill.1993), *aff'd*, 55 F.3d 239 (7th Cir. 1995); *United States v. Burnside*, 824 F.Supp. 1215 (N.D.Ill.1993); *United States v. Andrews*, 824 F.Supp. 1273 (N.D.Ill.1993). All of these cases involved the use of testimony of cooperating members of the El Rukn organization in prosecutions of the El Rukns for various crimes. Because two of the cooperating El Rukn witnesses, Earl Hawkins and Derrick Kees, also testified in this case, Maloney moved for a new trial. The district court, however, denied this and all other post-trial motions, ruling that the significance of the El Rukn testimony in this case was markedly different than in the El Rukn tri-

als. Maloney filed a timely notice of appeal and we have jurisdiction under 28 U.S.C. § 1291.

## II.

Maloney's argument on appeal is somewhat convoluted. According to Maloney, the prosecution's knowing use of perjured testimony and suppression of material impeachment evidence regarding the El Rukn witnesses prevented the jury from properly evaluating whether Judge Maloney returned the Hawkins/Field bribe, which was racketeering act five, on June 19th, 1986 or on June 27th, 1986. This issue appears insignificant given racketeering act six, the obstruction of justice activity in 1988 and 1990. According to Maloney, however, it becomes material in determining if the government met RICO's five-year statute of limitations if we also agree with one of two further arguments: (1) Maloney withdrew from the conspiracy when the bribe was returned; or (2) even if Maloney did not withdraw at that time, the obstruction of justice activity in 1988 and 1990 was insufficient to extend the conspiracy past the last aborted bribe. Agreeing with one of these two arguments is also a precondition to accepting Maloney's attacks on the statute of limitations instructions and the application of the Sentencing Guidelines. Finally, Maloney contends that the instruction on the RICO interstate commerce requirements, and the introduction of evidence on the Chow and Rosario bribes, were both erroneous. This house of cards, precarious on its face, falls flat upon closer analysis.

### A. Prosecutorial Misconduct

Maloney contends that during his trial the prosecution knowingly used false testimony and violated his right under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) to be shown exculpatory evidence that is in the prosecution's possession. In reviewing the denial of a motion for a new trial based upon such allegations, we defer to the district court's judgment as to whether the evidence wrongfully withheld by the government might if disclosed have changed the outcome of the trial. When this

question revolves on a pure issue of law, our review is *de novo.* *Boyd,* 55 F.3d at 242.

In order to receive a new trial for either the knowing use of false testimony or the suppression of exculpatory evidence, Maloney must establish that the evidence was "material," that is, that "there is a reasonable probability that, had it not been for the improprieties, the defendants would have been acquitted."[3] *Id.* at 245. "A 'reasonable probability' of a different result is accordingly shown when the Government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles v. Whitley,* — U.S. —, —, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). Maloney alleges government improprieties with respect to the testimony of Cooley, Swano and the El Rukn witnesses, Hawkins and Kees.

### 1. Cooley

Maloney claims that the prosecution suppressed a statement Cooley made in his first meeting with the government. He reportedly said that he "didn't have to bribe judges because he was with the First Ward, and when you were with the First Ward, everybody knew what was supposed to happen." According to Maloney, this statement rebutted his allegations of bribery in the Chow case. Cooley admitted at trial, however, that he "was not fully honest with them when [he] first started talking to them," thus explaining any inconsistency between his trial testimony and his prior statements. Furthermore, in view of the tapes of conversations between Cooley and Marcy confirming the existence of a fix, and the jury's findings that at least two other predicate acts occurred, it was not an abuse of discretion for the district court to find that this suppression was not material to the outcome of the case.

### 2. Swano

The prosecution allegedly withheld statements by one of Swano's former clients that revealed that Swano had told this client

in late 1991 to lie on his habeas petition. While the suppression of such impeachment evidence can give rise to a *Brady* violation, *see Kyles,* — U.S. at —, 115 S.Ct. at 1565 (citing *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)), it must be more than mere cumulative impeachment. *United States v. Kozinski,* 16 F.3d 795, 819 (7th Cir.1994). Because Swano admitted that he took witness recantation statements while suspecting that the witnesses had been intimidated into making the statements, as well as taking statements with full knowledge of their falsity, such evidence would have been merely cumulative and the district court did not abuse its discretion in so finding.

### 3. El Rukn witnesses

[8] According to the evidence introduced in other cases, William Hogan and the United States Attorney's Office for the Northern District of Illinois facilitated drug usage, sexual liaisons, and extensive personal phone calls, by cooperating witnesses from the El Rukn organization, including Hawkins and Kees. *See, e.g., Boyd,* 833 F.Supp. at 1296, 1324. This evidence of Hawkins' and Kees' post-incarceration criminal activity and receipt of benefits was not disclosed to the defense, nor was it fully testified to at trial. The district court, however, found that such evidence, even assuming it included false testimony and went beyond the realm of cumulative impeachment, was not material given the nature of Hawkins' and Kees' testimony. Because neither Hawkins nor Kees testified that they ever saw Swano pass the money along to Judge Maloney, or even his bagman, McGee, the El Rukn testimony was entirely consistent with the defense's "rain-making" theory.

Maloney responds that the suppressed evidence and borderline false testimony were significant in relation to Hawkins' testimony regarding what Swano told him about the return of the bribe and whether this conversation took place on the 19th or the 27th of

---

**3.** As for the alleged *Brady* violations, the district court assumed without deciding the question that the evidence was exculpatory and suppressed by the prosecution. As to the allegations of false testimony, the district court did note in passing

that some of the testimony was not false, but it did not elaborate on the basis for these findings. Thus, we will limit our discussion to the basis upon which the district court did rule—the lack of materiality.

June.[4] Under the prosecution's direct examination, Hawkins testified that Swano told him on June 19th that Judge Maloney had returned the bribe. The prosecution attempted to impeach this testimony with a prior inconsistent statement Hawkins made before trial. According to the government, Hawkins had told them earlier that Swano had merely stated on June 19th that the Judge wanted to give the money back, not that he already did. Maloney theorizes that if the jury had known how beholden Hawkins was to the prosecution, it would have inferred that his prior inconsistent statement that the bribe was returned on the 27th was an attempt to tell the prosecution what it wanted to hear. Under this argument, if the jury had discounted his prior inconsistent statement, it would have found the action to be time-barred. Maloney, however, makes a number of questionable assumptions in reaching this conclusion.

Initially, the argument assumes that the evidence of drug usage and government favors would have changed the impact of Hawkins' testimony in Maloney's favor. Hawkins' testimony on direct was that the bribe was returned on June 19th. Although the government impeached this testimony with a prior inconsistent statement that the money was returned on the 27th, the defense rehabilitated it on cross-examination and recross when Hawkins admitted that he had testified to the return being on the 19th in trials dating back to 1987 and he admitted that Swano told him the bribe was returned right before Anthony Sumner, a former El Rukn, testified, which was on the 19th. While it is possible the suppressed evidence would have bolstered Maloney's case, it is equally possible that Hawkins would have appeared to be a drug addict who could not be counted on to remember exact dates or conversations in any event. Maloney speculates that if Hawkins' testimony about the return being on the 27th was discredited, Swano's testimony would go uncorroborated and unbelieved on

that and all other subjects. That ultimate result is a fairly substantial stretch; it is perhaps more likely that if Hawkins' memory of dates became discounted altogether, then there would have been no one left to support Maloney's basis for the statute of limitations defense. There is no reasonable probability that disclosure of the information would have resulted in Maloney's acquittal on statute of limitations grounds.

Even if the suppressed evidence would have caused the jury to believe the bribe was returned on June 19th, it is still not material unless Maloney either withdrew from the conspiracy when the bribe was returned, or his later acts of witness tampering are insufficient to extend the conspiracy for statute of limitations purposes. Given our resolution of these two issues below, we do not find that the district court abused its discretion or committed legal error by denying Maloney's motion for a new trial.

## B. Withdrawal

 Maloney asserts that the district court erroneously refused to read his withdrawal instruction despite the evidence that the Hawkins bribe was returned. "Generally, a defendant is entitled to an instruction on any defense recognized in the law and supported by sufficient evidence to allow a reasonable jury to find in the defendant's favor." *United States v. Starnes,* 14 F.3d 1207, 1210 (7th Cir.), (quoting *United States v. Schweihs,* 971 F.2d 1302, 1322 (7th Cir. 1992)), *cert. denied,* —— U.S. ——, 114 S.Ct. 2717, 129 L.Ed.2d 842 (1994). We must decide *de novo* the question of whether Maloney introduced sufficient evidence to allow the jury to find, in accordance with the applicable law, that he withdrew from the conspiracy. *United States v. Casanova,* 970 F.2d 371, 374 (7th Cir.1992). In making this determination, we must remember that withdrawal requires an affirmative act on the part of the conspirator. He must either confess to authorities, or "communicate to

---

**4.** As to Kees, Maloney asserts that further impeachment would have tainted his translation of the El Rukn "code" on the surveillance tapes. Thus, when Kees inserted "bagman" into a few translations where his predecessor had not, the jury might have inferred this was done to please

the prosecution. Maloney, however, makes little attempt to point out the materiality of such a discovery. He only makes a tangential leap to how this would have affected Hawkins' testimony.

each of his conspirators that he has abandoned the conspiracy and its goals." *United States v. Sax,* 39 F.3d 1380, 1386 (7th Cir. 1994). Mere inactivity is not sufficient; the conspirator must "affirmatively renounce[ ] the goals of the criminal enterprise," *United States v. DePriest,* 6 F.3d 1201, 1206 (7th Cir.1993), by taking steps to "defeat or disavow the conspiracy's purpose." *Sax,* 39 F.3d at 1386.

Maloney asserts that the return of the Hawkins bribe was an affirmative act inconsistent with the conspiracy's purpose. This, however, ignores the conditional nature of the bribe and the circumstances surrounding it. Many indictments and convictions of judges had already occurred at this time as a result of the Greylord investigation. According to Swano, McGee told him that Judge Maloney agreed to accept the $10,000 bribe conditional upon Swano putting on "a good [defense] case." (Tr. 2571). Swano elaborated on what the members of the conspiracy understood this to mean in the instant case:

> The judge was worried about looking bad on a serious double-murder case like this. And I had to have the witnesses together and I had to do the case the way I described it to him; that the state had a weak identification case; that we had nullified Sumner and that we had, in fact, the eyewitnesses that would contradict the testimony of the state's witnesses. (Tr. 2571).

Swano emphasized "it wasn't a hundred percent guarantee. We had to put on a good defense." (Tr. 2586). This is what he told the El Rukns when he explained the fix to them. Thus, when McGee called to end the fix, he explained that "the State witnesses were too good, and the case was going too good for the State." (Tr. 2669). Several witnesses testified that the presence of FBI agents in the building and the courtroom during Hawkins' trial was obvious and a clear indication that the case was being closely monitored for a possible fix. Thus, the threshold standard for the appearance of propriety was raised. When Swano failed to effectively rebut the state's case, the fix was called off for good. According to Hawkins, Swano explained that "the case was too hot and he didn't want to go through with it no more ... that somebody had leaked it— somebody in the organization had leaked it to the FBI." (Tr. 1559–60). There was no evidence introduced that Maloney would be unreceptive to future bribes; the only evidence at all on the matter revealed merely that this bribe under these circumstances did not comport with the conspiracy's objectives and criteria for the fixing of cases. Maloney's return of the bribe was therefore more akin to a deal gone sour than an affirmative attempt to defeat the purposes of the conspiracy.[5] In *United States v. Pofahl,* 990 F.2d 1456, 1484 (5th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 266, 126 L.Ed.2d 218 *and cert. denied,* —— U.S. ——, 114 S.Ct. 560, 126 L.Ed.2d 460 (1993), a conspirator was scheduled to go to Guatemala to help arrange a shipment of drugs. After learning that a co-conspirator had been arrested, the conspirator canceled his scheduled trip. He argued that this was an affirmative act to withdraw from the conspiracy. The court disagreed, holding that "Nunn's decision to cancel his trip to Guatemala in the face of possible arrest is hardly an affirmative action to defeat the conspiracy." *Id.* It was an attempt to evade detection by canceling an act which was supposed to be in furtherance of the conspiracy, but this cannot equate to a withdrawal. By the same token Maloney may have canceled a bribe intended to be in furtherance of the RICO and extortion conspiracies, but this did not withdraw him from those conspiracies.

Maloney counters that the absence of any evidence of bribes after the return of the Hawkins bribe confirms that this was intended to signal a withdrawal. He admits that the inactivity itself cannot signal a withdraw-

---

5. The dissent contends that the jury might have reached a different conclusion had it been armed with the evidence of prosecutorial misconduct. Hawkins only changed his testimony as to the date the bribe was returned. Impeachment of his testimony, therefore, would not create evidence establishing Maloney's unwillingness to accept future bribes. Moreover, since it was Maloney's burden to provide such evidence, it would have been impermissible for the jury to infer it from the return of one bribe in the middle of a case or from the government's failure to provide evidence of additional bribes thereafter.

al, *see, Sax*, 39 F.3d at 1386, but argues that it evidences his intent to withdraw when the bribe was returned. This ignores the intermittent character of the conspiracy. After the Greylord investigation became public knowledge in 1983, the conspirators waited almost three years before attempting another bribe. As long as Judge Maloney remained on the bench, "the central criminal purpose" of the conspiracy, to fix cases whenever feasible, had not yet ended or been accomplished. *United States v. McKinney*, 954 F.2d 471, 475 (7th Cir.), *cert. denied*, 506 U.S. 1023, 113 S.Ct. 662, 121 L.Ed.2d 587 (1992). After the aborted Hawkins bribe, Swano continued to practice before Judge Maloney, and McGee and Maloney continued to meet. Nothing distinguished this post-Hawkins bribe inactivity from the post-Jones bribe inactivity. Thus, it was not error to deny Maloney's proposed withdrawal instruction.

### C. Obstruction of Justice

Maloney raises four arguments in support of reversing his obstruction of justice conviction under 18 U.S.C. § 1503 or limiting the extent to which the obstruction of justice count can be used in conjunction with the other counts: (1) it was based upon insufficient evidence; (2) the jury was given an improper instruction on the issue; (3) the alleged conduct is not actionable under § 1503; and (4) the obstruction of justice conviction is insufficient to extend the RICO conspiracy for statute of limitations purposes. We will address each argument in turn.

#### 1. Sufficiency of the Evidence

■ Section 1503 prohibits a person from endeavoring to obstruct or impede the "due administration of justice." To establish a violation of this section, courts require the government to establish that the defendant knew of a pending judicial proceeding and intended to impede its administration. *See United States v. Aguilar*, —— U.S. ——,

——, 115 S.Ct. 2357, 2362, 132 L.Ed.2d 520 (1995); *United States v. Edwards*, 36 F.3d 639, 645 (7th Cir.1994). Maloney argues that the evidence failed to establish either the existence of a pending judicial proceeding or his knowledge of it. We will reverse a conviction for insufficient evidence only if, after viewing the evidence in the light most favorable to the government, it is determined that no rational jury could have found the defendant guilty beyond a reasonable doubt. *United States v. Brandon*, 50 F.3d 464, 467 (7th Cir.1995).

■ There was substantial, unrebutted, evidence introduced to establish the existence of a pending judicial proceeding and Maloney's knowledge of it. Robinson stated that on May 5, 1988, before Maloney's first "standing tall" conversation with Swano, he testified before the grand jury and was asked questions about his passing of bribes to many specific judges, including Judge Maloney. In 1989, Robinson was summoned to again appear before the grand jury to testify on the same subject. On February 21, 1989, IRS investigator Dennis Czurylo specifically informed Maloney that he was the subject of a grand jury investigation and served him with subpoenas issued under the authority of this grand jury. Czurylo also testified that he served a total of approximately 300 grand jury subpoenas in his investigation of Judge Maloney.[6] IRS Agent Rick Kozma testified that he was brought into the grand jury investigation of Maloney in September of 1989 to aid Czurylo in evaluating the information they received from these subpoenas. The owner of the Park West Currency Exchange and a representative of an investment advisory firm both testified to having received subpoenas for information during this period. With the wide sweep of this grand jury investigation, it was clear that Maloney was aware it was pending when he spoke with Swano in the summer of 1990. In fact, Swano told him at the time that "I hear they are trying to put a tax case on you." (Tr.

---

**6.** Maloney argues that Czurylo's investigation was not clearly in aid of the grand jury investigation. *Cf. United States v. Ryan*, 455 F.2d 728 (9th Cir.1971) (conviction reversed because of transparent use of grand jury subpoenas in aid of unrelated IRS investigation). There was ample

testimony, however, that Agent Czurylo was conducting a cash flow analysis he had used to testify in the trials of several other judges who were charged with taking bribes and thus was clearly in aid of the grand jury investigation.

2765). Finally, Roby testified that in August of 1990, he was served by the FBI with a subpoena to appear before the grand jury to testify about his allegations that his case before Judge Maloney had been fixed, thus indicating that the grand jury proceeding was indeed still pending when Maloney had his second "standing tall" conversation with Swano. It is well established that investigations undertaken with the intention of presenting evidence before a grand jury are sufficient to constitute "the due administration of justice" under § 1503. *United States v. McComb,* 744 F.2d 555, 561 (7th Cir.1984).[7]

### 2. Jury Instructions

■ Maloney contends that the district court committed reversible error in its charge to the jury on the obstruction of justice count. Although the court gave the Seventh Circuit pattern jury instruction for obstruction of justice under § 1503,[8] it added its own supplemental instruction. This instruction stated that "[f]or purposes of Racketeering Act 6 and Count Four, the government need not prove that an official proceeding was actually pending or about to be instituted at the time of the offense." The government concedes that this was not an accurate statement of the law, but argues that any error was harmless.

The Supreme Court's most recent pronouncement on the harmless error standard for jury instructions came in *Sullivan v. Louisiana,* 508 U.S. 275, ——, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993). In holding that an erroneous reasonable doubt instruction could never constitute harmless er-

ror, the Court distinguished its case from erroneous jury instructions which erect a presumption about an element of the offense. *Id.* at ——, 113 S.Ct. at 2082. Thus, the Court's decision was consistent with the holding of *Rose v. Clark,* 478 U.S. 570, 580, 106 S.Ct. 3101, 3107, 92 L.Ed.2d 460 (1986), where the jury was erroneously instructed that malice, an element of the offense of second degree murder, could be presumed from the existence of the killing unless this presumption was rebutted by the defendant.

> '[w]hen a jury is instructed to presume malice from predicate facts, it still must find the existence of those facts beyond a reasonable doubt.' *Rose v. Clark,* 478 U.S. 570, 580, [106 S.Ct. 3101, 3107, 92 L.Ed.2d 460] (1986). And when the latter facts 'are so closely related to the ultimate fact to be presumed that no rational jury could find those facts without also finding that ultimate fact, making those findings is functionally equivalent to finding the element required to be presumed.' *Carella v. California,* 491 U.S. 263, 271 [109 S.Ct. 2419, 2423, 105 L.Ed.2d 218] (1989) (Scalia, concurring in judgment).

*Sullivan,* 508 U.S. at ——, 113 S.Ct. at 2082. In this situation, a reviewing court may find little difficulty in concluding that the presumption played no part in the jury's determination of the defendant's guilt beyond a reasonable doubt.

We had occasion to apply *Sullivan's* harmless error standard for instructional errors in *United States v. Parmelee,* 42 F.3d 387, 392 (7th Cir.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 63, 133 L.Ed.2d 25 (1995).

---

7. The defense asserts that Maloney's alleged conversation with Robinson where he warned him that Swano might be wearing a wire evidences a concern about law enforcement rather than a grand jury. This distinction is part of Maloney's meritless argument that Count IV of his indictment should have been dismissed for failing to allege the existence of a pending judicial proceeding. The indictment specified the existence of a federal law enforcement investigation, which is sufficient if the investigation is undertaken "to secure a presently contemplated presentation of evidence before the grand jury." *McComb,* 744 F.2d at 561. In any event, the conversation with Robinson took place in late 1986, long before the period when the obstruction of justice activity occurred.

8. That charge provided as follows:

Defendant Thomas J. Maloney is charged in Racketeering Act 6(A) and 6(B) and in Count Four with endeavoring to obstruct the due administration of justice. To sustain these charges, the government must prove the following propositions:

First, that defendant Maloney endeavored to obstruct the due administration of justice; and

Second, that defendant Maloney's acts were done knowingly and corruptly, that is, with the purpose of impeding the due administration of justice.

*Parmelee* involved the violation of a section of the immigration laws which prohibited a person from knowingly and willfully transporting an illegal alien within the United States. Although the district court instructed the jury that it must find that the defendant knew the alien he was transporting had entered the country illegally, it did not instruct the jury that it must find that the defendant did so willfully, in order to further the aliens illegal entry. *Id.* at 391. Although we recognized that "in theory" a jury could conclude that an individual knowingly but not willfully transported illegal aliens, we found that under the factual circumstances of the case, there was unrebutted evidence of the defendant's mental state in transporting the alien. *Id.* at 393. Thus, the instructional error was harmless. "[A] rational jury, which found that the defendants knew the aliens were illegal, also would have necessarily found that the defendants knew their activity furthered the aliens' violation of the law." *Id.*

The instant case is also well-suited for a harmless error determination under *Sullivan*. The district court through its supplemental instruction essentially permitted the jury to presume the existence of a pending judicial proceeding if it found an attempt to obstruct the due administration of justice. In order to find Maloney guilty of violating § 1503 under the district court's erroneous instruction, though, the jury still had to find beyond a reasonable doubt that he made one or both of the statements to Swano in an attempt to obstruct justice. Although in theory a jury under this instruction could convict an individual for obstruction of justice without any evidence of a pending judicial proceeding, the factual circumstances of this case suggest that the actual verdict was not so influenced. *See Parmelee,* 42 F.3d at 393. The factual finding of obstruction of justice is so closely related to the ultimate and unrebutted fact of the existence of a pending grand jury proceeding that the error is

harmless. For instance, Swano testified that after receiving Maloney's "standing tall" warning in the summer of 1990, he informed Maloney of his knowledge of the government's attempt to make out a tax case against him. Maloney therefore had knowledge that his statement to Swano could reasonably interfere with an investigation by the IRS. The only evidence introduced at trial of a "tax case," however, was the unrebutted testimony of IRS Agents Dennis Czurylo and Rick Kozma that they were investigating Maloney's financial records in aid of the grand jury investigation and had told Maloney of this fact. A finding that Maloney endeavored to obstruct the tax case against him is the same as a finding that he endeavored to obstruct the pending grand jury proceeding because the tax investigation was being pursued in aid of the grand jury investigation. Furthermore, it was unrebutted that a grand jury proceeding was pending between 1988 and 1990. There was no testimony that any investigation which took place during the period was somehow independent of the grand jury's authority.[9] Thus, because the jury found that Maloney endeavored to obstruct the due administration of justice, and because no rational jury could have failed to find the existence of a pending grand jury proceeding during Maloney's attempts to obstruct justice, then the instructional error could not have "contribute[d] to the jury's verdict of guilty." *Parmelee,* 42 F.3d at 393; *see Pope v. Illinois,* 481 U.S. 497, 503, 107 S.Ct. 1918, 1922, 95 L.Ed.2d 439 (1987).

### 3. Scope of § 1503

Maloney argues that the alleged obstruction of justice in this case, witness tampering, is not actionable under § 1503. In 1982, Congress enacted the Victim and Witness Protection Act ("VWPA") and removed from § 1503 all references to witnesses. Coupled with the enactment of § 1512, which deals with witness intimidation and harassment, the Second Circuit held that

---

**9.** We have long recognized "that it is usually the task of the United States Attorney's office, with the help of such agencies as the FBI, to amass and coordinate the evidence to be presented to a grand jury." *McComb,* 744 F.2d at 561. Thus, the jury could only infer that any attempt by Maloney to impede an FBI or U.S. Attorney's office investigation during the pendency of a grand jury proceeding was the same as an attempt to impede the pending grand jury proceeding itself.

Congress intended to remove witnesses entirely from the scope of § 1503, including from the omnibus clause. *See United States v. Hernandez,* 730 F.2d 895, 898 (2d Cir. 1984). This court, however, rejected such an "implied repeal" argument in *United States v. Rovetuso,* 768 F.2d 809, 824 (7th Cir.1985), *cert. denied,* 474 U.S. 1076, 106 S.Ct. 838, 88 L.Ed.2d 809 (1986), holding that "witness tampering may still be charged under § 1503" despite the enactment of the VWPA and § 1512.

Maloney responds that the 1988 amendments to the VWPA, which extended protection to witness persuasion as well as intimidation, undercut the rationale of *United States v. Lester,* 749 F.2d 1288, 1295 (9th Cir.1984), cited with approval by *Rovetuso,* 768 F.2d at 824, for the coexistence of witness tampering under both §§ 1503 and 1512. The Second Circuit, following its position in *Hernandez,* disparaged these cases on similar grounds in *United States v. Masterpol,* 940 F.2d 760, 763 (2d Cir.1991). This position, however, is still a minority one. Other circuits have continued to fall in line with *Rovetuso*'s holding after the 1988 amendments. *See, e.g., United States v. Moody,* 977 F.2d 1420, 1424 (11th Cir.1992), *cert. denied,* 507 U.S. 944, 113 S.Ct. 1348, 122 L.Ed.2d 730 (1993); *United States v. Kenny,* 973 F.2d 339, 342–43 (4th Cir.1992). In *Kenny,* the court pointed out the correctness of this approach:

> The omnibus clause of 18 U.S.C. § 1503 ... clearly encompasses acts "that obstruct, or impede, the due administration of justice." The fact that § 1512 more specifically addresses improper conduct involving a witness does not preclude application of § 1503. The existence of a more narrowly tailored statute does not necessarily prevent prosecution under a broader statute, so long as the defendant is not punished under both for the same conduct.

*Id.* at 342. We see no reason to depart from this analysis and our precedent on the question.

### 4. Ability to Extend the Conspiracy

Maloney's last argument with respect to the obstruction of justice count is that the obstruction of justice charges could not have extended the RICO conspiracy for statute of limitations purposes. He raises a number of points in support of this position.

 (a) Maloney contends that the obstruction acts were post-conspiracy attempts at concealment which could not have extended the conspiracy for statute of limitations purposes under *Grunewald v. United States,* 353 U.S. 391, 402, 77 S.Ct. 963, 972–73, 1 L.Ed.2d 931 (1957). In *Grunewald,* three individuals had fraudulently succeeded in obtaining "no prosecution" rulings from the Bureau of Internal Revenue in 1948 and 1949 for their tax evasion cases. Subsequent activities of the conspirators were directed at preventing detection of the irregularities in the manner in which they had secured the favorable rulings. *Id.* at 395, 77 S.Ct. at 969. The Court held that these subsequent activities could not be used to extend the original conspiracy for statute of limitations purposes because the main objective of the conspiracy had long been accomplished. *Id.* at 398, 77 S.Ct. at 970–71. The Court emphasized, however, that "a vital distinction must be made between acts of concealment done in furtherance of the *main* criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been obtained, for the purpose only of covering up after the crime." *Id.* at 405, 77 S.Ct. at 974; *see Ingram v. United States,* 360 U.S. 672, 679 n. 10, 79 S.Ct. 1314, 1319 n. 10, 3 L.Ed.2d 1503 (1959). Maloney suggests that *Grunewald* controls this case.

 Unlike *Grunewald,* however, the conspiracy's main criminal objective was never "finally attained" in this case. *United States v. Lash,* 937 F.2d 1077, 1082 (6th Cir.), *cert. denied,* 502 U.S. 949, 112 S.Ct. 397, 116 L.Ed.2d 347 (1991), *and cert. denied,* 502 U.S. 1061, 112 S.Ct. 943, 117 L.Ed.2d 113 (1992). A conspiracy ends when its main criminal objective has been accomplished or abandoned, *McKinney,* 954 F.2d at 475, i.e., "when the design to commit substantive misconduct ends." *Midwest Grinding Co., Inc. v. Spitz,* 976 F.2d 1016, 1024 (7th Cir.1992). A conspiracy to murder, for example, ends when the murder is committed. *McKinney,* 954 F.2d at 475. Unlike many of the Court's

concealment cases "where the object of the conspiracy was a discrete criminal act, here we deal with a crime that had no specific terminating event." *United States v. Mackey*, 571 F.2d 376, 383 (7th Cir.1978). "Where a conspiracy contemplates a continuity of purpose and a continued performance of acts, it is presumed to exist until there has been an affirmative showing that it has terminated...." *United States v. Elwell*, 984 F.2d 1289, 1293 (1st Cir.) (only event occurring between the last drug transaction and the indictment a year and a half later was an endeavor to obstruct justice), *cert. denied*, ⸺ U.S. ⸺, 113 S.Ct. 2429, 124 L.Ed.2d 650 (1993); *United States v. Coia*, 719 F.2d 1120, 1125 (11th Cir.1983) (quoting *United States v. Mayes*, 512 F.2d 637, 642 (6th Cir.), *cert. denied*, 422 U.S. 1008, 95 S.Ct. 2629, 45 L.Ed.2d 670 (1975)), *cert. denied*, 466 U.S. 973, 104 S.Ct. 2349, 80 L.Ed.2d 822 (1984); *United States v. Hamilton*, 689 F.2d 1262, 1268 (6th Cir.1982), *cert. denied*, 459 U.S. 1117, 1117, 103 S.Ct. 753, 754, 74 L.Ed.2d 971 (1983); *cf. United States v. Grubb*, 11 F.3d 426, 440 (4th Cir.1993) (although only an endeavor to obstruct justice occurred in the period before indictment for bribery and fraud, court found that "such activity was likely to continue for as long as Grubb remained in authority in Logan County.").[10] In the instant case, the main criminal objective, to fix cases whenever feasible, was neither accomplished nor abandoned as long as Judge Maloney remained on the bench, Swano continued to practice before him, and McGee continued his friendship with him.[11] Concealment, therefore, was an overt act in furtherance of the conspiracy's main objectives. *See United States v. Eisen*, 974 F.2d

246, 269 n. 8 (2d Cir.1992) ("acts or statements designed to conceal an ongoing conspiracy are in furtherance of that conspiracy"), *cert. denied*, 507 U.S. 998, 113 S.Ct. 1619, 123 L.Ed.2d 178 (1993). Maloney's statements to Swano helped to preserve his position on the bench—the essential ingredient in the conspiracy's ability to fix cases. *See United States v. LeFevour*, 798 F.2d 977, 982 (7th Cir.1986) ("the acts of concealment further[ed] the objects of the conspiracy—obtaining money—and result[ed] in lengthening its duration"); *United States v. Xheka*, 704 F.2d 974, 986 (7th Cir.), *cert. denied*, 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983); *United States v. Howard*, 770 F.2d 57, 60–61 (6th Cir.1985), *cert. denied*, 475 U.S. 1022, 106 S.Ct. 1213, 89 L.Ed.2d 325 (1986). Thus, *Grunewald* does not exclude the obstruction of justice acts from the RICO conspiracy for statute of limitations purposes.

■ (b) Maloney argues that his obstruction did not conduct the RICO enterprise through a pattern of racketeering activity under *Reves v. Ernst & Young*, 507 U.S. 170, 184–86, 113 S.Ct. 1163, 1173, 122 L.Ed.2d 525 (1993). According to the defense, in Maloney's endeavor to obstruct, unlike his taking of bribes, he was attempting to conduct his "*own* affairs" rather than the affairs of the enterprise, i.e., the Circuit Court. *Id.* Citing this court's holdings in *United States v. Crockett*, 979 F.2d 1204, 1213 (7th Cir.1992), *cert. denied*, 507 U.S. 998, 113 S.Ct. 1617, 123 L.Ed.2d 176 (1993) and *Overnite Transp. Co. v. Local No. 705*, 904 F.2d 391, 393 (7th Cir.1990), the defense argues that Maloney's endeavor to obstruct was not a function of his

---

**10.** The fundamental flaw in the dissent's argument with respect to the obstruction of justice count is the failure to recognize that a conspiracy contemplating a continuity of purpose and a continued performance of acts is presumed to exist until affirmatively proven otherwise. As long as the conspiracy is presumed to exist, acts of concealment are presumed to occur *during the period* of the conspiracy and are not introduced for the purpose of extending the life of the conspiracy.

**11.** Maloney suggests that the return of the bribe constituted an abandonment of the objectives of the conspiracy. As our discussion of withdrawal indicates, however, the bribe was canceled under

the terms of the agreement in which it was made and its return did not signal a reluctance to fix future cases in the event conditions were suitable. Maloney offered no other evidence to affirmatively show that the conspiracy ended. Just as during the inactivity between the Jones and Hawkins bribes, the conspirators continued to associate, they maintained their positions in the court, and none of them communicated a desire to abandon the conspiracy either to the others or to the government. "[T]he defendants utterly failed to affirmatively prove either that the conspiracy had been abandoned or that any of them had withdrawn. Such affirmative defenses are strict." *Hamilton*, 689 F.2d at 1269.

position on the court and had no effect upon it.[12]

The facts of this case belie Maloney's contentions. During both conversations with Swano, Maloney was an active judge of the Circuit Court of Cook County who at least co-operated or co-managed the enterprise with the other judges. *See Grubb*, 11 F.3d at 438–39 (citing *Reves*, 507 U.S. at 182–84, 113 S.Ct. at 1172). The first conversation followed a case conference in Judge Maloney's chambers which Maloney had arranged, and, under the authority of the Circuit Court, Swano was bound to attend. There was some testimony that Judge Maloney may have had most such case conferences in open court during this time, suggesting that he used his position in the court to secure a more private meeting. The second conversation also took place at the courthouse, which the Circuit Court required Swano to frequent as part of his representation of clients. Instead of calling Swano or arranging a meeting elsewhere, Judge Maloney chose to confront Swano at the courthouse where it would attract less suspicion for them to be seen together. In addition, Maloney's actions certainly had an effect on the enterprise, in that they helped preserve his position on the bench and prolong the possibility of fixing cases. Thus, in both instances, Maloney conducted the affairs of the enterprise when he attempted to obstruct justice.

■■■■■ (c) Maloney's last argument with respect to the obstruction count is that the conversations with Swano were not part of the RICO pattern. Under the "continuity plus relationship" test, a pattern is established by proving that "the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 2895–96, 106 L.Ed.2d 195 (1989). Maloney suggests neither element was present.

■■■■■ Maloney first argues that the obstruction acts were not sufficiently related, because they were not "committed somewhat

closely in time to [the other predicate acts], involve the same victim, or involve the same type of misconduct." *See Vicom, Inc. v. Harbridge Merchant Serv., Inc.*, 20 F.3d 771, 779 (7th Cir.1994), (quoting *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986)). Time alone does not defeat the pattern. "[A] three-year gap between the commission of predicate acts does not in and of itself amount to a failure to prove a pattern of racketeering activity." *United States v. Church*, 955 F.2d 688, 699 (11th Cir.), *cert. denied*, 506 U.S. 881, 113 S.Ct. 233, 121 L.Ed.2d 169 (1992). In fact, the gap is consistent with the time between the Jones and Hawkins bribes, reflecting the ongoing relationship of the conspirators. Furthermore, criminal acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 240, 109 S.Ct. at 2901. Under this relatively broad standard, the bribes are clearly related to their concealment. The endeavor to obstruct was an attempt to maintain Judge Maloney's position to fix future cases. It had the same underlying purpose as the other predicate acts and involved the same participants and the same ultimate victim—the integrity of the criminal justice system. *Cf. Grubb*, 11 F.3d at 440 (witness tampering in an attempt to conceal bribe was sufficiently related to the bribe itself for RICO pattern requirement).

■■■■■ Maloney also contends that the witness tampering occurred too long after the conspiracy to establish continuity. This, however, assumes that the conspiracy had ended at the last bribe. As we explained previously, there was ample evidence that the conspiracy was still on as long as Judge Maloney remained on the bench. *Id.* Thus, because the conspiracy was a long-term activity without "a natural end point," it certainly satisfies the continuity requirement. *Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1295 (7th Cir.1992). Moreover, both the bribes and the conceal-

---

12. The government suggests that the "facilitation and effect" test enunciated in these cases may not have survived *Reves*. We need not reach that question, however, because Maloney's actions satisfied the standard in either instance.

ment were "a regular way of conducting defendant's ongoing legitimate business." *H.J. Inc.*, 492 U.S. at 243, 109 S.Ct. at 2902. In addition to the bribes, Judge Maloney changed his bagman from Robinson to McGee, warned Robinson not to speak with Swano because he might be wearing a wire, spoke in code, and engaged in money laundering. Swano also told Cooley about Paul Baker, a possible government informant against them, and spoke to Hawkins concerning the possibility he might testify against him before the grand jury. Thus, there was sufficient evidence of a RICO pattern.[13]

### D. Statute of Limitations Instruction

■ The district court instructed the jury that Maloney could not be found guilty of the racketeering charge "unless you find that he committed one of the racketeering acts set forth in Count Two within five years of the return of the indictment which occurred on June 26, 1991. Thus, to find defendant Thomas J. Maloney guilty", the government must prove that he committed Racketeering Act 5 and/or Racketeering Act 6. Maloney argues that the use of the word, "thus," and its placement in the instruction, implied that both Act 5 and Act 6 fell within the limitations period, an issue in doubt with respect to Act 5. Further clouding the issue, according to Maloney, was that the court read a standard "on or about" instruction early on in its charge to the jury.[14] Neither of these arguments have merit. The statute of limitations instruction accurately reflected that one of the acts must have occurred no longer than five years before June 26, 1991. The district court's use of the term "thus" served to direct the jury's attention to Acts 5 and 6, the only acts which could possibly come within the limitations period. Any doubt the jury had after hearing the general "on or about" instruction was removed upon hearing this specific statute of limitations instruction and upon hearing it reread in answer to a jury question. Moreover, even if there was any error, it was harmless in light of the jury's verdict of guilty on Act 6, which was well within the limitations period, and our conclusion that this verdict should be allowed to stand. *See United States v. Neuroth*, 809 F.2d 339, 341–42 (6th Cir.), *cert. denied*, 482 U.S. 916, 107 S.Ct. 3190, 96 L.Ed.2d 678 (1987) (finding that an "on or about" instruction was harmless error despite the presence of an alibi defense).

### E. RICO Interstate Commerce Instruction

Relying on *United States v. Robertson*, —— U.S. ——, 115 S.Ct. 1732, 131 L.Ed.2d 714 (1995) and *United States v. Lopez*, —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), Maloney submits that the district court erred when it instructed the jury that the government must prove "that the Circuit Court of Cook County engaged in interstate commerce or its activity affected interstate commerce. . . . interstate commerce is affected if you find that the Circuit Court of Cook County has any impact, regardless of how small or indirect, on the movement of any money, goods, services, or persons from one state to another." According to Maloney, this instruction was erroneous in two respects. First, it impermissibly broadened the indictment by allowing the jury to find that the Circuit Court either engaged in or affected interstate commerce, while the indictment only charged that the Circuit Court affected interstate commerce. Second, the jury should have been charged with finding that the court "substantially affects" interstate commerce.

Maloney, however, did not raise these objections before the district court in accor-

---

13. Thus, because the obstruction of justice count is substantively valid, and because the acts of obstruction were part of an ongoing conspiracy which straddled the date in which the Sentencing Guidelines were enacted, the district court was correct in applying the Guidelines to Maloney's sentence. *See United States v. Morgano*, 39 F.3d 1358, 1369 (7th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 2559, 132 L.Ed.2d 813 (1995).

14. This instruction read as follows:

The indictment charges that the offense was committed "on or about" particular dates listed in each count. The government need only establish that the offense was committed on a date reasonably near the date charged.

dance with Fed.R.Crim.P. 30.[15] This court has often held that we may review for plain error any instructions which were not challenged below. *See United States v. Boyles,* 57 F.3d 535, 541 (7th Cir.1995); *United States v. Waldemer,* 50 F.3d 1379, 1386 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2598, 132 L.Ed.2d 845 (1995); *United States v. Baker,* 40 F.3d 154, 161–62 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1383, 131 L.Ed.2d 237 (1995); *United States v. Mounts,* 35 F.3d 1208, 1221 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1366, 131 L.Ed.2d 222, (1995); *United States v. Knapp,* 25 F.3d 451, 454–55 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 493, 130 L.Ed.2d 404 (1994). Some panels of the court, however, relying upon the distinction between forfeiture and waiver outlined in *United States v. Olano,* 507 U.S. 725, ——, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993), have held that the failure to object to an instruction constitutes a waiver of that objection and thus plain error review does not apply. *See United States v. Espino,* 32 F.3d 253, 258–59 (7th Cir.1994); *United States v. Lakich,* 23 F.3d 1203, 1207–08 (7th Cir.1994). Even these latter cases, though, perhaps out of an abundance of caution, have nonetheless discussed the objection under the plain error standard. Thus, we will review Maloney's objections for plain error.

■ Maloney's contention that the "engages in" language in the instruction impermissibly departed from the "affects" language in the indictment is not even error, let alone plain error. It is well settled that the power to regulate matters affecting interstate commerce is broader than the right to regulate interstate commerce itself. *See Russell v. United States,* 471 U.S. 858, 859 n. 4, 105 S.Ct. 2455, 2456 n. 4, 85 L.Ed.2d 829 (1985); *Scarborough v. United States,* 431 U.S. 563, 571–72, 97 S.Ct. 1963, 1967–68, 52 L.Ed.2d 582 (1977). Thus, the charge that the activities of the Circuit Court of Cook County "affected" interstate commerce is presumed to include evidence that it directly participated in interstate commerce as well as evidence that its intrastate activities had an effect on interstate commerce. There was no impermissible broadening of the indictment. *United States v. Miller,* 471 U.S. 130, 138, 105 S.Ct. 1811, 1816, 85 L.Ed.2d 99 (1985). The government presented uncontested evidence that the Circuit Court "directly engaged in the ... acquisition of goods and services in interstate commerce," through its purchase of law books and computer equipment and thus there was sufficient justification to introduce the instruction. *Robertson,* —— U.S. at ——, 115 S.Ct. at 1733, (quoting *United States v. American Building Maintenance Indust.,* 422 U.S. 271, 283, 95 S.Ct. 2150, 2157–58, 45 L.Ed.2d 177 (1975)).

■ Maloney's second argument is equally without merit. *Lopez*'s "substantially affecting" standard describes the requirement that, "viewed in the aggregate," statutes concern activities which substantially affect interstate commerce. *Id.,* —— U.S. at ——, 115 S.Ct. at 1631. "Where a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence." *Id.* at ——, 115 S.Ct. at 1629, (quoting *Maryland v. Wirtz,* 392 U.S. 183, 197 n. 27, 88 S.Ct. 2017, 2024 n. 27, 20 L.Ed.2d 1020 (1968)). Unlike RICO, the statute in *Lopez* "contain[ed] no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Id.* It is by no means "plain" that individual activities regulated by RICO must each "substantially affect" interstate commerce. *See Robertson,* —— U.S. at ——, 115 S.Ct. at 1733 (questioning whether or not, under the "affecting commerce" provision in RICO, the activities of the enterprise "would have to meet" the requirement of substantially affecting interstate commerce); *United States v. Stillo,* 57 F.3d 553, 559 n. 2 (7th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 383, 133 L.Ed.2d 306 (1995). Furthermore, even if the district court's instruction was error, Maloney made no attempt to establish that the error was prejudicial, i.e.,

---

**15.** Rule 30 provides in pertinent part: "No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection."

that it "affected the outcome of the District Court proceedings." *Olano,* 507 U.S. at ——, 113 S.Ct. at 1778. Maloney failed to allege that the government's evidence would not have survived an instruction requiring the jury to find that the Circuit Court "substantially affected" interstate commerce. Thus, we have no basis for finding plain error.

## F. Chow and Rosario Cases

Maloney argues that the district court improperly admitted evidence of Racketeering Act 1, the Chow fix, and evidence of the uncharged Rosario case. He contends that the Chow case should have been dismissed from the indictment and the Rosario case was improperly used as propensity evidence. We review these contentions for abuse of discretion. *See United States v. Cichon,* 48 F.3d 269, 274 (7th Cir.1995), *petition for cert. filed* (May 18, 1995); *Trytko v. Hubbell, Inc.,* 28 F.3d 715, 724 (7th Cir.1994).

### 1. Chow Case

 Maloney first argues that the Chow case was improperly included as part of the RICO conspiracy because it involved some participants, specifically Cooley and Marcy, who did not participate in the other predicate acts. This ignores the nature of § 1962(d). "This section of RICO is capable of providing for the linkage in one proceeding of a number of otherwise distinct crimes and/or conspiracies through the concept of enterprise conspiracy." *United States v. Neapolitan,* 791 F.2d 489, 501 (7th Cir.), *cert. denied,* 479 U.S. 940, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986); *see United States v. Gonzalez,* 921 F.2d 1530, 1540 (11th Cir.) ("The notion of 'enterprise conspiracy' ... has made much of the old distinction between 'single conspiracy' and 'multiple conspiracy' irrelevant to RICO conspiracy charges."), *cert. denied,* 502 U.S. 827, 112 S.Ct. 96, 116 L.Ed.2d 68 *and cert. denied,* 502 U.S. 860, 112 S.Ct. 178, 116 L.Ed.2d 140 (1991). To prove a single RICO conspiracy, the government need only show that the defendant agreed to conduct the affairs of the enterprise through the commission of two predicate acts. *United States v. Ashman,* 979 F.2d 469, 485 (7th Cir.1992), *cert. denied,* ——

U.S. ——, 114 S.Ct. 62, 126 L.Ed.2d 32 (1993). Thus, "a series of agreements that under pre-RICO law would constitute multiple conspiracies could under RICO be tried as a single 'enterprise' conspiracy if the defendants have agreed to commit a substantive RICO offense." *Neapolitan,* 791 F.2d at 496 n. 3, (quoting *United States v. Riccobene,* 709 F.2d 214, 224–25 (3d Cir.), *cert. denied,* 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983)). "So long as the alleged RICO co-conspirators have agreed to participate in the affairs of the same enterprise, the mere fact that they do not conspire directly with each other" does not convert the agreement to conduct the enterprise's affairs through a pattern of racketeering activity into multiple conspiracies. *United States v. Friedman,* 854 F.2d 535, 562 (2d Cir.1988), *cert. denied,* 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989); *accord United States v. Lee Stoller Enter., Inc.,* 652 F.2d 1313, 1319 (7th Cir.1981), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 615 (1982); *United States v. Hughes,* 895 F.2d 1135, 1140 (6th Cir.1990).

The government has certainly succeeded in establishing that Maloney agreed to conduct the affairs of the Circuit Court through several predicate acts, even though each predicate act did not involve the exact same participants. Furthermore, the facts of the instant case support the existence of a single RICO conspiracy. The common element in each predicate act was the involvement of Judge Maloney in his capacity as a Judicial Officer in the Circuit Court of Cook County and a desire of all participants to effect a "corruption of that office." *United States v. Hampton,* 786 F.2d 977, 981 (10th Cir.1986). Moreover, Swano's willingness to pass information about a federal investigation along to Cooley and his desire to discuss his problems in the Hawkins case with Cooley indicates the kind of common goals and mutual benefit between the lawyers seeking to obtain the bribes which supports the inference of a single RICO conspiracy. *See United States v. Stephens,* 46 F.3d 587, 593 (7th Cir.1995).

Thus, Chow was properly included within the indictment.[16]

Maloney also argues that Chow was improperly included in the substantive RICO count because it was based on hearsay testimony, Cooley's rendition of Marcy's statements regarding the fix, and thus was insufficiently proven. The government, however, introduced the evidence on a non-hearsay basis as a co-conspirators' statement under Fed.R.Evid. 801(d)(2)(E).[17] Furthermore, there was other evidence of the fix, including Judge Maloney's conduct during the bond hearing and trial and the requirement that Cooley add Herb Barsy, a friend of the Judge, to the defense team as a condition of the fix. Thus, Chow was properly included in Count Two and was validly relied upon during Maloney's sentencing. Any effect the evidence of this bribe had on the credibility of the evidence of the other bribes was a result of Maloney's direct participation in this fix and was not impermissible. *See Lee Stoller Enter., Inc.,* 652 F.2d at 1319; *Friedman,* 854 F.2d at 563.

### 2. Rosario

█ Finally, Maloney argues that the evidence of the uncharged Rosario bribe, ostensibly offered to prove his connection to the enterprise and the conspiracy, was unnecessary for that purpose and was therefore mere propensity evidence. Maloney suggests that it was unnecessary to establish that he was a Circuit Court judge because his status was not in dispute. During the Rosario case, however, Swano arranged a meeting with Judge Maloney to confirm that Robinson was his bagman and that he was indeed willing to fix cases. The evidence was not only offered to bolster Maloney's connection to the Circuit Court, but it was offered

to establish his connection to the conspiracy to accept bribes. It was clearly admissible for this purpose. *See Neapolitan,* 791 F.2d at 506.

### III.

For the above reasons, Maloney's conviction, and the district court's decision to deny his motion for a new trial, are Affirmed.

RIPPLE, Circuit Judge, dissenting.

I respectfully dissent from the affirmance of the district court's decision to deny the motion for new trial. In my view, if the jury had been permitted to hear the evidence of prosecutorial misconduct, it might well have rejected the government's submission that the conspiracy continued within the time period covered by the statute of limitations.

To fall within the statute of limitations, the conspiracy charged in this case must have continued within the five-year period before the date of the indictment. Therefore, it was incumbent upon the prosecution to establish that at least one racketeering act took place after June 25, 1986. The post-June 25, 1986 acts on which the government relies to prove the continuation of the conspiracy were the alleged return of the $10,000 bribe to Swano on June 27, 1986 (rather than on June 19, 1986), and the cover-up conversations, the "standing tall" admonition, between Maloney and Swano.[1]

### 1.

I cannot accept the government's submission that the jury's lack of knowledge with respect to Hawkins' relationship with the government could not have affected its evaluation of whether the money was repaid on

---

**16.** Even if the evidence had not supported the finding of a single RICO conspiracy, Maloney has not established that this prejudiced his substantial rights so as to require reversal of the conviction. *See United States v. LeQuire,* 943 F.2d 1554, 1561 (11th Cir.1991), *cert. denied,* 505 U.S. 1223, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992).

**17.** Maloney counters that this evidence could not have been admitted as co-conspirator's statements since the statements were made in 1986 and therefore could not have been in furtherance of the 1981 bribe. This assumes Maloney's first

argument—that the Chow fix was a separate conspiracy. Marcy continued to be a member of the overall RICO conspiracy and his statements to Cooley on the need to conceal the Chow fix were in furtherance of the conspiracy.

**1.** The government alleged that, in the summer of 1989, Maloney knew of the federal investigation of the *Hawkins–Fields* bribe and told Swano to refuse to cooperate. It further alleged that, in June or July 1990, Maloney again told Swano to refuse to cooperate.

June 19 rather than June 27. Indeed, my colleagues admit that the testimony could have made a difference in the jury's evaluation. Nor can I accept the proposition that keeping the jury in the dark with respect to this matter did not make a significant difference in the outcome.

My colleagues conclude that, even if the money was returned on June 19, as the defendant contends, that return could not have constituted a withdrawal from the conspiracy. In the majority's view, "Maloney's return of the bribe was ... more akin to a deal gone sour than an affirmative attempt to defeat the purposes of the conspiracy." In my view, this is a judgment that ought to be left to the jury. Government witness Earl Hawkins first testified that the bribe money was returned on June 19; after much questioning and eventual impeachment from Assistant United States Attorney Hogan, Hawkins changed his testimony to say that Maloney *said* he would return the bribe money on June 19, but he *actually returned* it on June 27, 1986.[2] If the jury had realized that Hawkins had a very definite motive to give the government the testimony it wanted to hear, its evaluation of his testimony may well have been different.

We have recently set forth the requirements for withdrawal:

> But proving one has withdrawn from a conspiracy is no easy matter, requiring the defendant to prove he both ceased participation in the conspiracy, *United States v. DePriest,* 6 F.3d 1201, 1206 (7th Cir.1993), and affirmatively disavowed the conspiracy's purpose, *United States v. Bafia,* 949 F.2d 1465, 1477 (7th Cir.1991), *cert. denied sub nom. Kerridan v. United States,* [504] U.S. [928], 112 S.Ct. 1989 [118 L.Ed.2d 586] (1992).

*United States v. Morgano,* 39 F.3d 1358, 1370 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2559, 132 L.Ed.2d 813 (1995). It is never enough merely to cease participation (even when the conspirator was terminated from the conspiracy, as in *Morgano* ). There must be an "affirmative act, such as a confession to authorities or a clear

communication to co-conspirators of abandonment of the conspiracy's goals." *Id.* at 1370–71; *see also United States v. Sax,* 39 F.3d 1380, 1386 (7th Cir.1994) (requiring that "the conspirator must take affirmative steps to *defeat* or *disavow* the conspiracy's purpose"); *United States v. Masters,* 924 F.2d 1362, 1368 (7th Cir.), *cert. denied,* 500 U.S. 919, 111 S.Ct. 2019, 114 L.Ed.2d 105 (1991) (discussing withdrawal as a "term of art in the law of conspiracy"). In this case, the jury was entitled to conclude on the basis of the evidence that Maloney had taken the affirmative act of returning the $10,000 bribe money. Such an act is certainly a communication, made to a fellow conspirator, of his abandonment of the conspiracy, and could constitute a withdrawal. There is no evidence of bribes or of case-fixing after this action, and thus no demonstration that Maloney continued to endorse the purpose of the conspiracy. *See Sax,* 39 F.3d at 1387.

A jury should be entitled to consider Hawkins' privileged treatment by the United States Attorney's Office in its evaluation of the lack of evidence of a continuation of the conspiracy.

### 2.

The majority also relies upon the "standing tall" admonition by the defendant to Swano as evidence that the conspiracy continued up to that point.

This reliance is dependent on the majority's view that the purpose and objective of the conspiracy was case-fixing, and that the conspirators had agreed that this activity would continue as long as Maloney was a judge. On that view, the conspiracy was neither accomplished nor abandoned as long as Judge Maloney remained on the bench, Swano continued to practice before him, and McGee continued his friendship with him. This view posits a conspiracy that is, for all practical purposes, of unlimited duration. In *Grunewald v. United States,* 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), the Supreme Court distinguished "between acts of concealment done in furtherance of the main crimi-

---

**2.** Testimony concerning the return of the bribe came from El Rukn gang member Earl Hawkins,

a cooperating witness. *See* Tr. 1559–70, 1648–49, 1697, 1709–10.

nal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime." *Id.* at 405, 77 S.Ct. at 974.

> The acts of covering up can by themselves indicate nothing more than that the conspirators do not wish to be apprehended— a concomitant, certainly, of every crime since Cain attempted to conceal the murder of Abel from the Lord.

*Id.* at 406, 77 S.Ct. at 974; *see also Ingram v. United States,* 360 U.S. 672, 679 n. 10, 79 S.Ct. 1314, 1319 n. 10, 3 L.Ed.2d 1503 (1959) ("[T]he life of the conspiracy cannot be extended by evidence of concealment after the conspiracy's criminal objectives have been fully accomplished."); *United States v. Finlay,* 55 F.3d 1410, 1415 (9th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 193, 133 L.Ed.2d 129 (1995). If, as we have previously held, the concealment of records and attempts to mislead the grand jury are simply cover-up activities, rather than a continuation of the actual conspiracy, *see United States v. Roberts,* 22 F.3d 744, 750–51 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 744, 130 L.Ed.2d 645 (1995), then surely two brief conversations between Maloney and Swano, held a year apart, unconnected to any specific actions, cannot be considered a continuation of the conspiracy.[3] Under this theory, as long as there is the potential for a bribe, Maloney could never withdraw from the conspiracy. Given our case law, this characterization is a much too slender reed on which to base a theory of continued conspiracy. Indeed, even when we have found that conspirators "intended from the first to exert strenuous efforts to prevent discovery of the crime and of their involvement in it," *Masters,* 924 F.2d at 1368, we have recognized that efforts to conceal a conspiracy are not automatically a part of the conspiracy.

More fundamentally, even if the jury should have been permitted to reach, on the evidence before it, the conclusion that the conspiracy included the "standing tall" inci-

dents, its consideration of this issue was impermissibly skewed by the absence of information concerning Hawkins' motivation to support the case of the government. Had the jury known of Hawkins' affiliation, it might have determined that the conspiracy terminated on June 19. If it had so determined, it necessarily would not have characterized the Maloney–Swano conversations as part of that conspiracy.

---

**3.** In *United States v. LeFevour,* 798 F.2d 977 (7th Cir.1986), we also considered whether a cover-up conspiracy is separate from the original conspiracy (judge taking bribes). In this case the act of concealment was a note written by a coconspirator *during the period* that the judge was still taking bribes. 798 F.2d at 982. We upheld the admission of that note into evidence as an act of concealment that furthered the object of the conspiracy.